# Exhibit A

# SUMMONS - CIVIL
JD-CV-1 Rev. 4-16
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. §§ 3-1 through 3-21, 8-1, 10-13

### STATE OF CONNECTICUT
## SUPERIOR COURT
*www.jud.ct.gov*

**See other side for instructions**

- [ ] "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.
- [ ] "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.
- [x] "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* *(C.G.S. §§ 51-346, 51-350)* | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* | | |
|---|---|---|---|---|
| **235 CHURCH STREET, NEW HAVEN, CT 06510** | ( 203 ) 503 6800 | May | 23 | 2 017 |
| | | Month | Day | Year |

| [x] Judicial District | [ ] G.A. | At *(Town in which writ is returnable)* *(C.G.S. §§ 51-346, 51-349)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| [ ] Housing Session | | **NEW HAVEN** | Major: **C** | Minor: **00** |

### For the Plaintiff(s) please enter the appearance of:

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| **MICHELSON, KANE, ROYSTER & BARGER, P.C., 10 COLUMBUS BLVD, HARTFORD, CT 06106** | 037781 |

| Telephone number *(with area code)* | Signature of Plaintiff *(If self-represented)* |
|---|---|
| ( 860 ) 522 1243 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | [x] Yes [ ] No | Email address for delivery of papers under Section 10-13 *(if agreed to)* **SKAPLAN@MKRB.COM** |
|---|---|---|

| Number of Plaintiffs: 1 | Number of Defendants: 1 | [ ] Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | | Name *(Last, First, Middle Initial)* and Address of Each party *(Number; Street; P.O. Box; Town; State; Zip; Country, if not USA)* | |
|---|---|---|---|
| **First Plaintiff** | Name: | **Developers Surety and Indemnity Company** | P-01 |
| | Address: | **17771 COWAN, SUITE 100, IRVINE, CA  92614** | |
| **Additional Plaintiff** | Name: | | P-02 |
| | Address: | | |
| **First Defendant** | Name: | **Carothers Construction, Inc** | D-01 |
| | Address: | **31 HIGHWAY 328, OXFORD, MS  38655;  PO BOX 189, TAYLOR, MS 38673** | |
| **Additional Defendant** | Name: | | D-02 |
| | Address: | | |
| **Additional Defendant** | Name: | | D-03 |
| | Address: | | |
| **Additional Defendant** | Name: | | D-04 |
| | Address: | | |

## Notice to Each Defendant

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at *www.jud.ct.gov* under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at *www.jud.ct.gov* under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. **The Clerk of Court is not allowed to give advice on legal questions.**

| Signed *(Sign and "X" proper box)* | [x] Commissioner of the Superior Court [ ] Assistant Clerk | Name of Person Signing at Left **STEVEN B. KAPLAN** | Date signed 4/28/17 |
|---|---|---|---|

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts. | File Date |
| b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law. | |
| c. The Clerk is not permitted to give any legal advice in connection with any lawsuit. | |
| d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | |

| I certify I have read and understand the above: | Signed *(Self-Represented Plaintiff)* | Date | Docket Number |
|---|---|---|---|

RETURN DATE: May 23, 2017          : SUPERIOR COURT

                                           :

DEVELOPERS SURETY AND INDEMNITY COMPANY : JUDICIAL DISTRICT OF

                                           : NEW HAVEN at NEW HAVEN

vs.                                             :

                                            :

CAROTHERS CONSTRUCTION, INC.           : APRIL 27, 2017

## VERIFIED COMPLAINT

1.       The Plaintiff, Developers Surety and Indemnity Company, (hereinafter "DSI"), is a California corporation duly organized and operating under the laws of the State of California, with offices in Irvine, CA. At all times relevant hereto, DSI has been licensed to issue surety bonds in the State of Connecticut.

2.       Defendant, Carothers Construction, Inc. (hereinafter "Carothers") is a Mississippi corporation with offices located in Taylor, Mississippi.

3.       The events and issues involved in this matter arise out of a construction project located in Branford, Connecticut, known as "Roofing System for the Bridgeport Army Reserve Center" (hereinafter "the Project").

4.       On or about February 3, 2015, DSI, as surety, issued a Subcontract Performance Bond and Payment Bond, Bonds No. 505470P (hereinafter "the Bonds") for the Project in the penal sum of $384,728.00 on behalf of its principal, Seven Hill Construction, LLC, (hereinafter "Seven Hills"), which was a subcontractor to Carothers, the general contractor on the Project. (Copies of the Bonds are attached hereto as "Exhibit A.")

1

5.     The Bonds were issued in conjunction with the Subcontract for the roofing system for the Project between Seven Hills and Carothers, which Subcontract was executed in September, 2014. (Subcontract attached hereto as "Exhibit B").

6.     Only Seven Hills and Carothers were signatories to the Subcontract; DSI, the surety on the Bonds, was not a signatory to the Subcontract.

7.     During the course of performance on the Project, disputes arose between Seven Hills and Carothers that resulted in Carothers declaring Seven Hills in default, and providing notice to the Surety in May 2016 that Carothers was going to complete the Seven Hills work on the Project.

8.     Thereafter, Carothers made claims for monetary damages to DSI pursuant to the Bonds.

9.     DSI has denied the Bond claims by Carothers based on various good faith defenses.

10.     On or about April 2017, Carothers filed a Demand for Arbitration with the American Arbitration Association wherein it named only DSI as the sole Respondent (hereinafter "the Demand")(attached hereto as "Exhibit C").   In its Demand, Carothers seeks to arbitrate its disputes with DSI as to the Project, as well as other disputes it has with DSI in regard to another, unrelated project located at Fort Leavenworth, Kansas for which DSI issued separate performance and payment bonds for Seven Hills.

11.     In this same Demand for Arbitration, Carothers has also included claims against DSI as to other  performance and payment bonds issued by DSI for a different  subcontractor, Liberty Enterprises Specialty Contractor, LLC, in regard to two unrelated  projects located at Fort Benning, Georgia, and Beaufort, South Carolina.

12.     As the basis for its Demand seeking arbitration of its disputes with DSI regarding the Project (Connecticut),  Carothers has referred to an agreement to arbitrate as set forth in its Subcontract with

2

Seven Hills for the Project, which states in relevant part:

> Section 19.   Except as otherwise specifically provided therein, all claims, disputes, and other matters in controversy **between the Contractor and the Subcontractor**, arising out of or related to this Subcontract shall be decided by binding arbitration in accordance with the current and applicable Construction Industry Rules of the American Arbitration Association, unless the parties both agree to different rules and procedures.   The sole exception to binding arbitration between the Contractor and Subcontractor is as follows:  If the Contractor in good faith believes that any claim, dispute, or matter in controversy with the Subcontractor also involves the rights or liabilities of the Owner, Architect, or other third party, then, at the contractor's sole election, the Subcontractor agrees to resolve such issues in the same forum or proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some all claims, disputes, and matters in controversy including the Owner, Architect, or other third party so as to promote economy and avoid inconsistent results.

(Emphasis added; *see* Ex. B.)  The Subcontract also states in Section 19, as amended, that the "locale for any arbitration or litigation **involving the Subcontractor and the Contractor** shall be at a mutually agreed location." (Emphasis added).  Section 19 also provides further:

> Should the contractor through litigation, arbitration or other means seek to recover on any surety bond given by the Subcontractor under this Subcontract, the Subcontractor and its surety, jointly and severally, agree to pay Contractor all costs, expenses, and attorney's fees incurred in the investigation, preparation and trial or hearing of such matters and otherwise reasonably related thereto.

13.   Section 20 of the Subcontract expressly provides that "the laws of the State where the Project is located shall govern the interpretation and enforceability of this Subcontract."  Since the Project at issue is located in Connecticut, the laws of Connecticut govern the interpretation and enforceability of the Subcontract.

14.   As stated above,  DSI was not a signatory to the Subcontract between Carothers and Seven Hills.  Moreover, DSI has never agreed to arbitration as a method of dispute resolution as to any matters arising out of or pertaining to the Bonds or the Project in question.

15.   The Bonds states that the "Subcontract is incorporated by reference herein in its entirety and

3

made an integral part of this" Bond. ( *See* Ex. A.)  But neither the Bonds, nor the Subcontract, make any reference to mandating arbitration as the method of dispute resolution as  between the Surety (DSI) and the Obligee (Carothers), or for matters arising out of the Bonds.

16.    Moreover, the Performance Bond states as follows:

> 5. ENFORCEMENT BY OBLIGEE. **This Subcontract Performance Bond shall be governed by the laws of the place of the Project** which shall be interpreted insofar as possible to require Surety to perform fully the Subcontract Work and to satisfy completely all of Principal's responsibilities under its Subcontract with Obligee for so long as the Obligee may be held liable with respect to the Subcontract Work, such that, to the fullest extent allowed by law, if any claim arising from or related to the Princiapal's alleged failure to comply strictly with the Subcontract or if any claim with respect to Obligee's liability pertaining to the Subcontract Work is asserted against the Obligee, against any bond or other security furnished by the Obligee, or against persons or entities to whom the Obligee may be liable, such claim is also covered by this Subcontract Performance bond, subject only to the penal sum hereof.

(Emphasis added; *see* Ex. A.)  (As used therein, Carothers is the "Obligee" on the Bond, and Seven Hills is the "Principal.")  Similar language is set forth in paragraph 3 of the Payment Bond.  Since the Project is located in Connecticut, the laws of Connecticut govern the interpretation and enforceability of the Bond.

17.    The Performance Bond also states as follows:

> 6. RIGHT OF ACTION: No right of action shall accrue on this Subcontract Performance Bond to or for the use  of any person or entity other than the Obligee and Obligee's heirs, executors, administrators  assigns, and legal successors.  **Obligee is entitled to bring an action against Surety on this Subcontract Performance Bond,** including specific performance of Surety's obligations hereunder, without being required to name the Principal.

(Emphasis added; *see* Ex. A.)

18.    Defendant improperly seeks to arbitrate its stated claims against DSI under the Bonds, and to compel DSI to arbitrate those claims based on the contention that the Bond incorporates by

4

reference the Subcontract.

19.     DSI disputes and denies that it is party to any agreement whereby it agreed to arbitrate any claims, disputes, or other matters in controversy between DSI and Defendant, or that it agreed to arbitrate any matters arising out of or relating to its Subcontract Bonds, or its liability, obligations or rights thereunder.

20.     Under Connecticut law, the issue of whether a valid, enforceable agreement to arbitrate exists between the parties is a matter to be determined by the courts.

21.     As a result of the foregoing, the rights, status, and other legal relations between DSI and Defendant relative to the existence of a valid, binding and enforceable agreement to arbitrate – including arbitration of the claims currently at issue in Defendant's Demand for Arbitration -- are uncertain, and an actual and justiciable controversy exists between DSI and Defendant regarding whether DSI must submit to arbitration.

22.     Per the foregoing, and in accord with Superior Court Rule §17-55, and Conn. Gen. Stat. §52-29:

> (a) DSI has a legal and equitable interest in determining the proper method of dispute resolution as to claims arising under the subject bond;
>
> (b) There is uncertainty as to the proper method of dispute resolution that adheres to claims asserted against the Bond;
>
> (c) There is an actual and bona fide dispute as to whether DSI can be compelled to participate in the arbitration proceedings that have been brought against it by Carothers, or in any similar arbitration proceedings brought by Carothers, in regard to the subject Bond; and
>
> (d) The question of arbitrability of disputes is a question for this Court, inasmuch as the parties have never agreed otherwise.

23.     Accordingly, Plaintiff DSI seeks declaratory relief per Conn. Gen. Stat. §52-29 that

prescribes the respective rights of the parties hereto, specifically that there is no agreement between DSI and Carothers to arbitrate disputes pertaining to, or arising out of, the subject Bond.

24.     Per the foregoing, and inasmuch as DSI never agreed to arbitrate matters pertaining to the Bonds, DSI will suffer irreparable harm if it is forced to proceed in the subject arbitration, or in any arbitration proceeding, to defend Carothers' claims pertaining to, or arising out of, the Bonds.

25.   There is no other adequate remedy at law other than those remedies sought herein.

26.     Moreover, per the foregoing, a permanent injunction should issue, per the provisions of Conn. Gen. Stat. §52-471, that bars Carothers from proceeding with its claims against DSI regarding the subject Project and Bonds in any forum other than a court of competent jurisdiction in the State of Connecticut.

27.  Per the Verification of  Ms. Cherie Rondinelli,  Senior Claims Examiner for the Plaintiff, DSI, attached hereto, the foregoing allegations have been verified under oath by a competent witness and representative of the Plaintiff.

WHEREFORE, Plaintiff requests:

1. Per Conn. Gen. Stat. §52-29, and §§17-54 through 17-56 of the Superior Court Rules, issuance of a declaratory judgment and order that Plaintiff DSI never agreed, either explicitly or by implication, to arbitrate any claims or disputes with Defendant, Carothers Construction Co., arising under the Performance and Payment Bond issued by DSI for the project known as "Roofing System for the Bridgeport Army Reserve Center" in Branford, CT; and

2. Per Conn. Gen. Stat. §52-471, issuance of a permanent injunction restraining the Defendant, Carothers Construction Co., from pursuing any claims against Plaintiff, Developers Surety and Indemnity Company, in regard to the Performance and Payment Bonds issued by DSI for the project known as "Roofing System for the Bridgeport Army Reserve Center" in Branford, CT, in any dispute resolution forum other than a court of competent jurisdiction in the State of Connecticut; and

3. Such other relief at equity or law as this Court may order.

THE PLAINTIFF, DEVELOPERS SURETY AND INDEMNITY COMPANY

By: _____
        Steven B. Kaplan
        Michelson, Kane, Royster & Barger, P.C.
        Juris No. 037781
        Ten Columbus Boulevard
        Hartford, CT 06106
        Tel: (860)522-1243
        Fax: (860)548-0194
        Email: skaplan@mkrb.com

## VERIFICATION

STATE OF FLORIDA:

COUNTY OF  PINELLAS:

ss. at  St. Petersburg

The undersigned,   Cherie Rondinelli,  being duly sworn, does hereby depose and as follows:

1.   I am over eighteen years of age and believe in the  obligation of an oath, and am competent to

testify as to the matters stated herein.

2.   At all times relevant hereto, I have been Senior Claims Examiner for the Plaintiff, Developers

Surety and Indemnity Company, and am thoroughly familiar with the matters at issue in this

lawsuit;

3.   I have closely reviewed the allegations of the Verified Complaint in this matter, and attest to the

truth of the foregoing to the best of my knowledge and belief.

Further, Affiant sayeth not.

Cherie Rondinelli

Subscribed and sworn to before me at St. Petersburg, Florida, on this 7 th day of April, 2017.

Notary Public:
My commission Expires on: _11-11-2019_

GEORGE SHEETS
MY COMMISSION # FF 932266
EXPIRES: November 11, 2019
Bonded Thru Notary Public Underwriters

8

# EXHIBIT A

Bond # 505470P

# SUBCONTRACT PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, THAT    **Seven Hills Construction, LLC**
as Principal, herein called the Principal, and    **Developers Surety and Indemnity Company**    ,
a Corporation organized and existing under the laws of the State of    **Iowa**
as Surety, herein called the Surety, are held and firmly bind themselves, their heirs, executors,
administrators, assigns, and legal successors with this Subcontract Performance Bond, jointly and severally,
in an amount of **Three Hundred Eighty Four Thousand Seven Hundred Twenty Eight and 00/100** Dollars
in U.S. Funds ($    **384,728.00**    ) unto Carothers Construction, Inc., as Obligee and herein
called the Obligee, for Principal's timely, full, and proper performance of the Subcontract between Obligee
and Principal with respect to Roofing System under Bridgeport Army Reserve Center Branford, CT
herein called the Project.  **Contract No. W912QR-14-C-0024**

WHEREAS, Principal has entered into with the Obligee a Subcontract dated September 23, 2014
with respect to the Project, which Subcontract is incorporated by reference herein in its entirety and made
an integral part of this Subcontract Performance Bond, said Subcontract being referred to herein as the
Subcontract and the scope and extent of Principal's work, undertakings, and obligations pursuant to the
Subcontract being referred to as the Subcontract Work.

NOW, THEREFORE, THE CONDITIONS OF THIS SUBCONTRACT PERFORMANCE BOND
AND OF SURETY'S OBLIGATIONS are such that if the Principal shall timely, properly, and completely
perform the Subcontract Work in strict accordance with the Subcontract and fully satisfy all of Principal's
obligations under the Subcontract without loss, cost, or liability to Obligee, then Surety's Obligations shall be
void, otherwise, this Subcontract Performance Bond and Surety's Obligations hereunder shall remain in full
force and effect; and this Subcontract Performance Bond and Surety's Obligations are further made subject
to and are governed and defined by the following:

1.        SURETY'S CURE OF PRINCIPAL'S FAILURE TO PERFORM.  Whenever the Principal
has failed to perform any part of the Subcontract Work fully, in the manner, and within the time required, or
whenever the Principal has failed to perform any of its obligations under the Subcontract, upon notice from
the Obligee, Surety at its own expense and promptly under the circumstances, but in no event more than 30
days after Obligee's notice,  shall do one of the following:

1.1        Arrange for the Principal, with consent of the Obligee, to perform fully and in
every respect complete the Subcontract Work in accordance with the
Subcontract terms and conditions; or

1.2        Undertake itself to perform fully and complete in every respect the Subcontract
Work, through Surety's agents or independent contractors acceptable to the
Obligee; or

1.3        Obtain bids or negotiated proposals from qualified contractors, acceptable to the
Obligee, for full performance and completion in every respect of the Subcontract
Work in strict accordance with the Subcontract, arrange for a new subcontract to
be prepared and executed by the Obligee and the contractor selected with the
Obligee's concurrence, secure new performance and payment bonds equivalent
to the bonds issued pursuant to the Subcontract to be executed by a qualified
surety acceptable to the Obligee, and place Obligee with funds to cover all
shortfall between (a) the existing unpaid balance left in Principal's Subcontract
and (b) the amount of the new subcontract to complete Principal's Subcontract
Work plus the amount of any damages, costs, and liability incurred by Obligee or
for which Obligee may be responsible as a result of the Principal's performance
failures; or



EXHIBIT
8



1.4     Pay Obligee the penal sum of this Bond; or

1.5     Deny liability and explain in written detail to the Obligee the reasons for such denial;

1.6     Deny liability in part with full written justification given to Obligee and arrange for satisfaction of that part of Principal's obligations for which Surety does acknowledge liability in accordance with subparagraphs 1.1 through 1.4 above.

With regard to any of these actions taken by Surety, with the sole exception of a complete denial of liability proven to be justified, the Surety shall promptly compensate Obligee for all damages for delays to the Project, both liquidated and actual, and all other damages, costs, and expenses, including but not limited to attorneys' fees, caused by or attributable to the Principal's failure to perform the Subcontract Work and all of its obligations under the Subcontract such that the Subcontract will be completed in strict accordance with its terms without any expenditure by Obligee or loss, cost, or liability to Obligee.

2.     INDEMNIFICATION.  To the fullest extent allowed by law, Principal and Surety, jointly and severally, shall defend, hold harmless, and indemnify the Obligee of and from all loss, liability, damage, or expense, including attorneys' fees, arising from or related to any failure by the Principal to perform the Subcontract Work and all of its obligations under the Subcontract fully, timely, properly, safely, and in strict compliance with the Subcontract.

3.     PENAL SUM.  The penal sum of this Subcontract Performance Bond as stated in U.S. Dollars above shall be increased by the amount of change orders to or amendments of the Subcontract between Principal and Obligee, the Surety hereby waiving notice of and right to consent to such changes and amendments.

4.     ALTERATION NOTICE WAIVER.  Any alterations, additions or changes which may be made in the terms of the Subcontract or in the Subcontract Work, or the giving by the Obligee of any consent to assign or sublet the Subcontract Work or any part thereof, or the giving by the Obligee of any extension of time for the performance of the Subcontract or any forbearance on the part of either the Obligee or the Principal to the other, shall not in any way release or diminish the liability and obligations hereunder of either of the Principal and the Surety, their respective heirs, executors, administrators, successors or assigns, notice to the Surety of any such alteration, change, addition, consent, extension or forbearance being hereby waived.

5.     ENFORCEMENT BY OBLIGEE.  This Subcontract Performance Bond shall be governed by the laws of the place of the Project which shall be interpreted insofar as possible to require Surety to perform fully the Subcontract Work and to satisfy completely all of Principal's responsibilities under its Subcontract with Obligee for so long as the Obligee may be held liable with respect to the Subcontract Work, such that, to the fullest extent allowed by law, if any claim arising from or related to the Principal's alleged failure to comply strictly with the Subcontract or if any claim with respect to Obligee's liability pertaining to the Subcontract Work is asserted against the Obligee, against any bond or other security furnished by the Obligee, or against persons or entities to whom Obligee may be liable, such claim is also covered by this Subcontract Performance Bond, subject only to the penal sum hereof.

6.     RIGHT OF ACTION.  No right of action shall accrue on this Subcontract Performance Bond to or for the use of any person or entity other than the Obligee and Obligee's heirs, executors, administrators, assigns, and legal successors.  Obligee is entitled to bring an action against Surety on this Subcontract Performance Bond, including specific performance of Surety's obligations hereunder, without being required to name the Principal.

IN WITNESS WHEREOF, authorized representatives of the above bound Principal and Surety have executed this Subcontract Performance Bond under their respective seals, this the ___3rd___ day of ___February___ ___2015___.

Witness (of if a Corporation, corporate secretary attest):

*Dara M Harris*

**Seven Hills Construction, LLC**

(Principal)                                                    (Seal)

By: *Thomas J Hockycko*

Name: *Thomas Hockycko*

Title: *President*

If Corporation, affix seal.

-AND-

**Developers Surety and Indemnity Company**

Attach Corporate Secretary Attest or Certificate of Authority

P.O. Box 19725 Irvine, CA 92623

(Surety)                                                      (Seal)

By: *

Name:    Joshua A. Etemadi

Title:    Attorney-in-Fact
         * Attach current Power of Attorney

**Not Required - Retaliatory**

Countersignature of Surety's Agent or Representative Resident in the State of the Project (if different from above and if required by laws of the State of the Project)

SURETY BOND RIDER

To be attached to and form part of Bond No.  505470P      in the amount of  $ 384,728.00             on

behalf of Seven Hills Construction, LLC , as Principal, and executed by  Developers Surety and Indemnity Company                , as

Surety, in favor of        Carothers Construction, Inc.              , as Obligee.

Effective date of change:          February 3, 2015

In consideration of the mutual agreements herein contained, the Principal and Surety hereby consent to the following changes to the aforementioned Performance and Payment bonds:

Change #3 of the Performance Bond, From:
PENAL SUM: The penal sum of this Subcontract Performance Bond as stated in U.S. Dollars above shall be increased by the amount of change orders to or amendments of the Subcontract between Principal and Obligee, the Surety hereby waiving notice of and right to consent to such changes and amendments.

To:
PENAL SUM: The penal sum of this Subcontract Performance Bond as stated in U.S. Dollars above shall be increased by the amount of change orders to or amendments of the Subcontract between Principal and Obligee, the Surety hereby waiving notice of and right to consent to such changes and amendments; **PROVIDED HOWEVER, that if, at any point, the Subcontract Sum is increased by more than 20%, either singularly or in the aggregate, of the original Subcontract Sum, then the Surety's consent shall be required to increase the penal sum of this bond.**

And

Change #4 of the Payment Bond, From:
The Surety waives notice of and right to consent to alterations, additions, changes, time extensions, and amendments of whatever nature to the Subcontract between Principal and Obligee. The penal sum of this Subcontractor Payment Bond shall be increased by the amount of change orders to or amendments of the Subcontract.

To:
The Surety waives notice of and right to consent to alterations, additions, changes, time extensions, and amendments of whatever nature to the Subcontract between Principal and Obligee. The penal sum of this Subcontractor Payment Bond shall be increased by the amount of change orders to or amendments of the Subcontract, **PROVIDED HOWEVER, that if, at any point, the Subcontract Sum is increased by more than 20%, either singularly or in the aggregate, of the original Subcontract Sum, then the Surety's consent shall be required to increase the penal sum of this bond.**

The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, Administrators, and successors and assigns to the Owner for the Performance and Payment of the Construction Contract, which is incorporated herein by reference except, in the event and to the extent that any terms and conditions of the incorporated contract documents conflict or are inconsistent with the terms of this Performance and Payment Bond and Rider, the terms of this Performance and Payment Bond and Rider shall take precedent and shall control.

Nothing herein contained shall vary, alter or extend any provision or condition of this bond except as herein expressly stated.

SIGNED, SEALED AND DATED THIS  3rd  day of   February         2015   .

Seven Hills Construction, LLC                    Developers Surety and Indemnity Company
Principal                                        Surety

By: _Thomas Hockyko_                             By: _____
Name: _____                          Name: Joshua A. Etemadi   Title: Attorney-In-Fact
Thomas Hockyko  Pres/Dent

The foregoing Rider is hereby accepted:

Carothers Construction, Inc.
Obligee

_____  02/05/2015
Name: _____          Title: _____
JAMES GRIFFITH
PURCHASING

**POWER OF ATTORNEY FOR**
**DEVELOPERS SURETY AND INDEMNITY COMPANY**
PO Box 19725, IRVINE, CA 92623  (949) 263-3300

KNOW ALL BY THESE PRESENTS that except as expressly limited, DEVELOPERS SURETY AND INDEMNITY COMPANY, does hereby make, constitute and appoint:

***Rachel McLaughlin, Joshua A. Eternadi, Edin R. Zukanovic, David A. Zeckman, Kimberly D. Santiago, jointly or severally***

as its true and lawful Attorney(s)-in-Fact, to make, execute, deliver and acknowledge, for and on behalf of said corporation, as surety, bonds, undertakings and contracts of suretyship giving and granting unto said Attorney(s)-in-Fact full power and authority to do and to perform every act necessary, requisite or proper to be done in connection therewith as each of said corporation could do, but reserving to each of said corporation full power of substitution and revocation, and all of the acts of said Attorney(s)-in-Fact, pursuant to these presents, are hereby ratified and confirmed.

This Power of Attorney is granted and is signed by facsimile under and by authority of the following resolution adopted by the Board of Directors of DEVELOPERS SURETY AND INDEMNITY COMPANY, effective as of January 1st, 2008.

RESOLVED, that a combination of any two of the Chairman of the Board, the President, any Executive Vice-President, Senior Vice-President or Vice-President of the corporation be, and that each of them hereby is, authorized to execute this Power of Attorney, qualifying the attorney(s) named in the Power of Attorney to execute, on behalf of the corporation, bonds, undertakings and contracts of suretyship; and that the Secretary or any Assistant Secretary of the corporation be, and each of them hereby is, authorized to attest the execution of any such Power of Attorney;

RESOLVED, FURTHER, that the signatures of such officers may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures shall be valid and binding upon the corporation when so affixed and in the future with respect to any bond, undertaking or contract of suretyship to which it is attached.

IN WITNESS WHEREOF, DEVELOPERS SURETY AND INDEMNITY COMPANY has caused these presents to be signed by its officers and attested by its Secretary or Assistant Secretary this November 16th, 2012.

By: 
Daniel Young, Senior Vice-President

By:
Gregg N. Okura, Vice-President

State of California
County of Orange

On _____ November 16, 2012 _____ before me, _____ Antonio Alvarado, Notary Public
Date                                                                Here Insert Name and Title of the Officer

personally appeared _____ Daniel Young and Gregg N. Okura
Name(s) of Signer(s)

ANTONIO ALVARADO
COMM. # 1860643
NOTARY PUBLIC CALIFORNIA
ORANGE COUNTY
My comm. expires Aug. 8, 2013

Place Notary Seal Above

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ 
Antonio Alvarado, Notary Public

**CERTIFICATE**

The undersigned, as Secretary or Assistant Secretary of DEVELOPERS SURETY AND INDEMNITY COMPANY does hereby certify that the foregoing Power of Attorney remains in full force and has not been revoked and, furthermore, that the provisions of the resolution of the Board of Directors of said corporation set forth in the Power of Attorney are in force as of the date of this Certificate.

This Certificate is executed in the City of Irvine, California, this 3rd day of February 2015.

By: _____
Mark J. Lansdon, Assistant Secretary

ID-1438(Rev.11/12)

 

Bond # 505470P

## SUBCONTRACTOR PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS, THAT **Seven Hills Construction, LLC** as Principal, herein called the Principal, and **Developers Surety and Indemnity Company** a Corporation organized and existing under the laws of the State of **Iowa** as Surety, herein called the Surety, are held and firmly bind themselves, their heirs, executors, administrators, assigns, and legal successors with this Subcontractor Payment Bond, jointly and severally, in an amount of **Three Hundred Eighty Four Thousand Seven Hundred Twenty Eight and 00/100** Dollars in U.S. Funds ($ **384,728.00** ) unto Carothers Construction, Inc., as Obligee and herein called the Obligee, for the use and benefit of Obligee and of Claimants, as hereinafter defined, and of Obligee with respect to **Roofing System under Bridgeport Army Reserve Center Branford, CT Contract No. W912QR-14-C-0024** herein called the Project.

WHEREAS, Principal has entered into with the Obligee a Subcontract dated **September 23, 2014** with respect to the Project, which Subcontract is incorporated by reference herein in its entirety and made an integral part of this Subcontractor Payment Bond, said Subcontract being referred to herein as the Subcontract and the scope and extent of Principal's work, undertakings, and obligations pursuant to the Subcontract being referred to as the Subcontract Work.

NOW, THEREFORE, THE CONDITIONS OF THIS SUBCONTRACTOR PAYMENT BOND AND OF SURETY'S OBLIGATIONS are such that if the Principal shall timely, properly, and completely pay all Claimants without loss, cost, or liability to Obligee, then Surety's Obligations under this Subcontractor Payment Bond shall be void, otherwise this Subcontractor Payment Bond and Surety's Obligations hereunder shall remain in full force and effect; and this Subcontractor Payment Bond and Surety's Obligations are further made subject to and are governed and defined by the following:

1.     "Claimant" is defined as and includes any one of the following:

     a.     a person or entity that has not been paid in full for labor performed and material furnished with respect to the Subcontract Work for the referenced Project pursuant to a direct contractual arrangement with the Subcontractor; or

     b.     any other person or entity that provides to or on behalf of Subcontractor with respect to the Subcontract Work for the referenced Project labor, material, equipment, goods, or services of whatever nature for which such person or entity has not received full payment and as to which:

         i.     such person or entity is entitled to file a lien or other encumbrance upon the premises of the Project, upon improvements thereon, or upon funds owed to Obligee by Owner of the Project, or

         ii.     such person or entity is entitled to recover on any bond or other instrument provided by Obligee or by virtue of any obligation imposed upon Obligee with respect to the Project, or

         iii.     Obligee has made payment to the Subcontractor, or

         iv.     Obligee has incurred or is subjected to risk of incurring any loss, cost, liability, or other detriment, whether actual or contingent.

2.     This Subcontractor Payment Bond shall be primary to any bond furnished by Obligee and to any other obligation of Obligee to pay Claimants. Amounts owed to Claimants will be paid in full first from this Subcontractor Payment Bond before any other means or right of recovery by Claimants, including but not limited to a bond, payment guaranty, or security furnished by Obligee with respect to the Project and to lien rights or causes of action which Claimant may assert against the premises of the Project, against Project improvements, against funds owed to Obligee on the Project, or against those to whom the Obligee may be liable. Obligee shall be entitled to specific performance from Subcontractor's Surety of

**EXHIBIT**

9

this payment priority.  In addition to other rights of the Obligee hereunder, if Obligee pays any Claimant, Obligee shall be subrogated to all rights of such Claimant as regards this Subcontractor Payment Bond.

3.      This Subcontractor Payment Bond is governed by the law of the place of the Project, which shall be interpreted insofar as possible to obligate Principal and Surety to make payment in full to Claimants for so long as Obligee may incur any liability to Claimants, such that, to the fullest extent allowed by law, if any claim may be made by any Claimant against Obligee, against any bond furnished by Obligee, against the premises of the Project, against funds owed Obligee with respect to the Project, or against persons or entities to whom Obligee may be liable, said claim shall also be covered by this Subcontractor Payment Bond, subject only to the penal sum hereof.

4.      The Surety waives notice of and right to consent to alterations, additions, changes, time extensions, and amendments of whatever nature to the Subcontract between Principal and Obligee.  The penal sum of this Subcontractor Payment Bond shall be increased by the amount of change orders to or amendments of the Subcontract.

5.      The Principal and the Surety, jointly and severally, shall defend, hold harmless, and indemnify the Obligee of and from all liability and expense, including attorneys' fees, arising from or related to any notice, claim, lien, or action filed by a Claimant alleging nonpayment by Principal of any indebtedness or obligation with respect to the Subcontract Work for the Project.

IN WITNESS WHEREOF, authorized representatives of the above bound Principal and Surety have executed this Subcontractor Payment Bond under their respective seals, this the __3rd__ day of __February__, __2015__.

Witness (of if a Corporation, corporate secretary attest):

_Dara m Haron_

**Seven Hills Construction, LLC**
(Principal)                                              (Seal)

By: _Thomas J Hockycko_

Name: _Thomas Hockycko_

Title: _President_

If Corporation, affix seal.

Attach Corporate Secretary Attest or Certificate of Authority

- AND -
**Developers Surety and Indemnity Company**
P.O. Box 19725 Irvine, CA 92623
(Surety)                                              (Seal)

By: * _____

Name: _Joshua A. Etemadi_

Title: Attorney-In-Fact
* Attach current Power of Attorney

**Not Required - Retaliatory**
Countersignature of Surety's Agent or Representative
Resident in the State of the Project (if different from above and if required by laws of the State of the Project)

Page 2 of 2

# EXHIBIT B

RECEIVED
SEP 2 9 2014

Carothers Construction, Inc.                         CONTRACT NO: 512-038820
Post Office Box 189                                  COST CODE: 07540-S
Taylor, MS 38673
Phone: 662-513-8820      Fax: 662-234-3292

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

This Subcontract is made this the 23RD day of September 2014, by and between Carothers Construction, Inc., hereinafter called the Contractor, and Seven Hills Construction, LLC., hereafter called the Subcontractor.

Shipping Address:                                    Mailing & Remit to Address:

Seven Hills Construction, LLC.                       Seven Hills Construction, LLC.
241 Annidale Avenue                                  21430 Timberlake Road, PMB #326
Salisbury, NC 28144                                  Lynchburg, VA 24502

Contact        Bill Tate                             Email: bill.t@7hillsllc.com
Phone:         (540) 588-1384
Fax:           (727) 299-8014
Cell:          (540) 578-1234

Fed Tax ID #:  20-5024207

For the consideration stated hereafter and in exchange for the mutual covenants herein made, the Subcontractor and Contractor hereby agree as follows:

**Section 1. (See Scope of Work, Attachment "A" Hereto)**

The Subcontractor shall furnish all labor, materials, tools, equipment, facilities, supervision, management, financing, services, shop drawings, submittals, testing, and every other thing of whatever nature necessary to fully perform and its every respect complete the work generally described as follows: Roofing System for the Project known as Bridgeport Army Reserve Center, Branford, CT, Contract No. W912QR-14-C-0024, RFP No. W912QR-14-R-0021 for Contract Documents dated 13 January 2014 (drawings) and 11 February 2014 (specifications), including Amendments No. 0001 dated 02/28/14, No. 0002 dated 04/21/14, No. 003 dated 05/12/14, No.04 dated 07/02/14, and amendment No.005 dated 07/07/14 for all work in the Base Bid along with Option A, F, and G together with applicable Wage Decision clauses prepared by U.S. Army Corps of Engineers, Louisville District, hereafter referred to as the "Architect". The Subcontractor's work as generally described above shall be performed wherever required on the Project. Applicable specification sections include but are not necessarily limited to: (See Scope of Work, Attachment "A")

The Subcontractor shall perform work in strict accordance with this Subcontract and with the Prime Contract, which is made a part hereof. Anything pertaining to the Subcontractor's work that is mentioned in the specifications but not shown in the drawings, or shown in the drawings but not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. All work of the Subcontractor shall be subject to the approval of the Contractor, Architect, Owner, and any authorities having jurisdiction over the Subcontract work. The Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto, and it further includes everything reasonably necessary or customary for the proper execution, functioning, connection, and completion of all work referred to by this Subcontract.

**Section 2.**

In exchange for the Subcontractor's full and timely performance of the Subcontract work in strict accordance with the terms and conditions of this Subcontract, the Contractor agrees to pay the Subcontractor the sum of Three Hundred Seven Thousand Seven hundred Eighty Two Dollars ($307,782.00), subject to any increase or decrease that may be mutually agreed upon in writing and further subject to the Standard Terms and Conditions, specifically including but not limited to the conditioned payment provisions of Section 8 below and all other requirements set forth in or incorporated by reference into this Subcontract.

## STANDARD TERMS AND CONDITIONS

**Section 3.**

The Subcontractor shall be bound to the Contractor by all terms and conditions of this Subcontract, and, except as otherwise provided herein, by all terms and conditions of the Prime Contract between the Owner and Contractor, which is incorporated by reference into this Subcontract and is an integral part of this Subcontract. The Prime Contract includes, but is not limited to, the Agreement between the Contractor and the Owner, all general, supplementary, special conditions; all drawings, specifications, details, and standards; all addenda, modifications, and revisions to any of the foregoing, and all other documents or requirements incorporated into or referenced by the foregoing. The Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Prime Contract, assumes toward the Owner. In the event of an ambiguity or conflict in payment or other provisions between the Prime Contract and the Subcontract, this Subcontract shall govern.

**Section 4.**

Time is of the essence of this Subcontract. The Subcontractor shall begin and proceed with its work when and as directed by the Contractor. The Subcontractor shall coordinate and continuously perform its work competently, efficiently, and at a speed so as to facilitate the general progress of the Project. The Subcontractor shall not delay, disrupt, damage, or render more expensive the work of the Contractor or any other subcontractor. If so ordered by the Contractor, the Subcontractor shall prosecute certain portions of the Subcontract work in preference to other portions, or an increase in Subcontract price. The Subcontractor shall reimburse the Contractor for any damages assessed by the Owner against the Contractor or otherwise incurred by the Contractor as a result of delays or difficulties caused by or attributable to the Subcontractor. Furthermore, the Subcontractor shall pay the Contractor's acceleration costs, extended job site overhead, unabsorbed home office overhead, and all other direct and indirect expenses of whatever nature, including attorneys' fees, caused in whole or in part by delays, disruptions, or other reasons attributable to the Subcontractor.

In the event the Subcontractor's work is delayed, disrupted, damaged, or rendered more expensive by the Owner or by Architect or others for whom the Owner may be liable, the Subcontractor as its sole and exclusive remedy may upon written request properly made to the Contractor obtain time extensions and an increase in the Subcontract price but only to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner for such delays, disruptions, damages, and added expense. If the Subcontractor's work is impermissibly delayed or disrupted by the Contractor or by others for whom the Contractor may be liable, the

EXHIBIT
7

Carothers Construction, Inc.
Post Office Box 189
Taylor, MS 38673
Phone: 662-513-8820    Fax: 662-234-3292

CONTRACT NO. 512-038820
COST CODE: 07540-S

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

Subcontractor as its sole and exclusive remedy may upon written request properly made to the Contractor obtain only time extensions, but no monetary damages, for proven critical path delay to the Subcontractor's work. As a condition precedent to any relief, the Subcontractor must give the Contractor written notice of any event alleged to cause delay, disruption, damage, and/or added expense to the Subcontractor's work within five (5) days after the Subcontractor first knew or should have known of such event, with such notice stating the specific relief sought by the Subcontractor with respect to such event.

**Section 5.**

The work included in this Subcontract shall be performed under the supervision of the Contractor, whose decision as to the true intent, proper construction, and correct meaning of the drawings and specifications shall be final. Subcontractor shall conform to and abide by any additional specifications, drawings and/or explanations furnished by the Contractor to detail and illustrate the work to be done.

Before proceeding with any work, the Subcontractor shall lay out and field measure all work, and the Subcontractor shall verify all previous and surrounding work done by others to ensure that all work fits and functions properly. The Subcontractor shall detect and, prior to commencement of work, report in writing to the Contractor any defect, interference, or nonconformity in the work of others or in the plans and specifications; and if the Subcontractor fails to do so, the Subcontractor shall be solely responsible for and bear all costs of any cutting, patching, rerouting, replacement, or other which the Contractor directs to overcome or correct such problems.

The Subcontractor recognizes that it may be working concurrently with the Contractor, separate subcontractors, and others. The Contractor has the right to require the Subcontractor, without cost or liability to the Contractor, to schedule work hereunder in such a manner as will minimize interference, delay and expense of work of others or for the best interests of the Project as the Contractor may determine.

If a question or dispute arises as to which subcontractor is responsible for any item of work, the Contractor shall determine the responsible subcontractor and that subcontractor shall proceed immediately to perform the work at no additional cost to the Contractor. The Contractor shall have no liability for its decision if exercised in good faith. If the Contractor's decision is not acceptable to all parties, any aggrieved subcontractor shall be entitled to resolve the matter through arbitration with other affected subcontractors in accordance with the rules of the American Arbitration Association.

**Section 6.**

The Subcontractor guarantees and warrants the Subcontract work to comply strictly with this Subcontract and with all parts of the Prime Contract applicable thereto. The Subcontractor further warrants and guarantees that the Subcontract work and all materials and equipment furnished in connection therewith are new, of good material and workmanship, free from defects, fit, safe, merchantable, and sufficient for the purposes intended. These warranties and guarantees shall extend for the same period as the Contractor's warranty under the Prime Contract or for one year after final payment to the Subcontractor, whichever is longer. The warranties and guarantees set forth herein are in addition to any other warranties or guarantees required by the Prime Contract, provided by law, or set forth by separate agreement. Any Subcontract work not conforming to the requirements of this Subcontract, including substitutions not properly authorized, shall be considered defective and shall be promptly replaced or corrected as directed by the Contractor.

**Section 7.**

If required by the Contractor prior to or during performance of this Subcontract, the Subcontractor shall furnish to the Contractor, as obligee, a performance bond and a payment bond with a responsible surety, acceptable to the Contractor, each for the amount of this Subcontract covering the Subcontractor's faithful performance of this Subcontract and prompt payment for all labor, material, equipment, services and any other items furnished to or used by the Subcontractor with respect to the Project. The Subcontractor's failure to deliver satisfactory bonds within ten (10) days after demand shall be a material breach of this Subcontract.

**Section 8.**

At times and intervals directed by the Contractor, the Subcontractor shall present to the Contractor an application for payment with such form and content as requested by Contractor and subject to Contractor's approval. Subcontractor's application must include an itemized statement of the work properly performed by the Subcontractor during the period for which payment is being requested.

Notwithstanding anything to the contrary in this Subcontract, in the Prime Contract, or in any bond or other document, the Contractor's approval of the Subcontractor's work for which payment is requested and the Contractor's actual receipt of payment from the Owner for such work shall be absolute conditions precedent to any right of the Subcontractor to receive any form of payment whatsoever from the Contractor. Both progress payments and final payment to the Subcontractor shall be made only out of funds actually received by the Contractor from the Owner for progress payments or for final payment of the Prime Contract and only to the extent said progress payments or final payment reflect Subcontract work which has been satisfactorily performed by Subcontractor in strict accordance with this Subcontract and which has been approved and paid by Owner. Subcontractor hereby expressly warrants and agrees that Subcontractor is relying on the credit and solvency of the Owner and not the Contractor for payment of work performed under this Subcontract.

Subject to the above provisions and all other terms and conditions of this Subcontract, the Contractor agrees to pay the Subcontractor's application for payment within the time required by the FAR Prompt Payment regulations after the Contractor's actual receipt of payment from the Owner for the Contractor's application in which the Subcontractor's application is incorporated. If the amount paid by the Owner with respect to the Subcontract work is less than the amount billed by the Subcontractor, the Contractor shall be obligated to pay the Subcontractor only the amount actually paid by the Owner and received by the Contractor for the Subcontractor's work.

The Contractor may, at its option, withhold up to ten percent (10%) retainage from payments otherwise due the Subcontractor hereunder until final payment. Final payment and release of retainage shall be made at the completion of the work covered by this Subcontract, but only: (1) upon written acceptance thereof by the Contractor, Architect, and Owner, (2) after Subcontractor has provided documentation specified by the Prime Contract, by this Subcontract, and as otherwise reasonably required by the Contractor; and (3) as a condition precedent, the Owner has made final payment and has released retainage to the Contractor.

Acceptance of final payment by the Subcontractor constitutes a general release of the Contractor and the Contractor's surety from all claims and liability of whatever nature. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Subcontractor shall remain responsible and liable for performance in strict compliance with this Subcontract.

Revised 05/2010

-2-

Initial:  Subcontractor _____  Contractor _**05S**_

Carothers Construction, Inc.                     CONTRACT NO. 512-038820
Post Office Box 189                              COST CODE: 07540-S
Taylor, MS 38673
Phone: 662-513-8820      Fax: 662-234-3292

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

**Section 9.**

Before submitting any application for payment, the Subcontractor shall have paid all material, labor, equipment, and other bills and obligations that relate to this Subcontract, through the period covered by previous payments received from the Contractor, and the Subcontractor shall furnish, at Contractor's request, affidavits, lien releases, and other such evidence as Contractor may require to verify compliance with this requirement. As a condition precedent to final payment to the Subcontractor, and in addition to the conditions precedent to final payment to the Subcontractor set forth in Section 8 above, the Subcontractor shall furnish Contractor an affidavit of payment of all bills and obligations, a release of liens or other encumbrances respecting the Project, and a general release of claims, together with such affidavits and other documents as may be required by the Contractor, with the understanding that such releases shall be effective as to owed but unpaid contract balances and retainage upon receipt of payment for same.

**Section 10.**

The Subcontractor shall, at all times, furnish and maintain: adequate tools, facilities and equipment; sufficient numbers of qualified workmen; at least one competent, nonworking superintendent present at the Project site at all times of Subcontractor performance; proper materials and supplies which must comply timely with the Prime Contract; and any other thing necessary or desirable so as to enable the Subcontractor to prosecute its work efficiently and properly. The Subcontractor shall promptly pay for all materials purchased, labor employed, independent contractors engaged, equipment rented, and bills incurred, and at Contractor's request, Subcontractor shall furnish Contractor with a duly executed affidavit showing that all Subcontractor's obligations with respect to this Project have been fully satisfied.

The Subcontractor hereby agrees that the Contractor has the right to pay any bills or past due obligations of the Subcontractor arising on this Project, including backcharges owed to the Contractor. Any such payments made by the Contractor, whether by joint check, direct payment, offset or otherwise, shall apply as a payment of earned proceeds (exclusive of retainage) on this Subcontract. The Contractor shall further have the option, but not the obligation, to use funds otherwise earned by the Subcontractor on this Project or other projects to pay the Subcontractor's past due bills and obligations, including backcharges owed to the Contractor whether on this Project or any other project. If there is a default or performance failure of any nature, including the Subcontractor's failure to pay bills or discharge obligations as they become due on any other project involving the Contractor, the Contractor may use funds otherwise owed on this Project to pay bills and discharge obligations on other projects. Any decision made by the Contractor pursuant to this paragraph shall be final and binding.

**Section 11.**

Should the Subcontractor, at any time, refuse, neglect, or fail: to furnish and maintain sufficient labor, material, equipment, services, or supervision; or to pay for labor, equipment or material furnished to or used by the Subcontractor; or to prosecute the work covered by this Subcontract with promptness and diligence so as not to delay either work of others or the Project as a whole; or to perform any term or condition of this Subcontract, all of which are considered material; then upon any one of these events, the Contractor may, at its option, after notice to Subcontractor, do one or more of the following: (1) supplement the Subcontractor with labor, material, and equipment; or (2) terminate this Subcontractor in whole or in part and complete the Subcontract with the Contractor's own forces or with others; or (3) issue a deductive change to eliminate portions of the Subcontract work; or (4) take any other action which the Contractor in good faith deems reasonable under the circumstances. In the event of any failure or inadequacy of performance by the Subcontractor, the Subcontractor shall be liable to the Contractor for all expenditures made and all damages, losses, expenses, attorneys' fees, and costs of whatever nature, incurred by the Contractor in supplementing the Subcontractor, in completing the Subcontract, or otherwise as a result of Subcontractor's performance delays or failures.

In the event of termination of the Subcontract, in whole or in part, the Contractor may, at its option and without prejudice to or waiver of any other right or remedy, take possession of materials, tools, equipment, facilities, and other property belonging to Subcontractor at the Project site and assume complete control of the Subcontract work. In case of partial or total termination of this Subcontract, Subcontractor shall not be entitled to receive any further payment under this Subcontract until the Subcontractor's entire work has been completed and accepted by the Contractor, Architect and Owner, all obligations of the Subcontractor have been satisfied, and final payment for the Subcontractor's performance has been made by the Owner and actually received by the Contractor. If the charges, losses, expenses, attorneys' fees, and damages sustained by the Contractor in completing the Subcontract work or otherwise attributable to Subcontractor's performance delays or failures exceed the unpaid portion of the Subcontract amount, the Subcontractor shall pay the difference to Contractor within five days after demand for same by Contractor.

Notwithstanding anything to the contrary in this Subcontract and in addition to the Contractor's right to terminate this Subcontract for breach or default, the Contractor may terminate all or any part of this Subcontract, regardless of fault or the lack thereof by any party. Upon such no-fault termination, the Subcontractor shall be entitled to payment for Subcontract work satisfactorily performed and accepted by the Owner, Architect, and Contractor in the amount of the lesser of either (1) the reasonable value of such work or (2) the reasonable, actual direct costs for such work plus a single allowance, not to exceed ten percent (10%), for overhead (both job site and home office) and profit on such costs. The Subcontractor shall not be entitled to any payment, compensation, or damages, including but not limited to lost profits or other theory of recovery, with respect to Subcontract work not performed or not accepted. If the Contractor terminates the Subcontract for default or breach but it is determined, for any reason, that sufficient grounds did not exist for terminating the Subcontract, the Subcontractor, as its sole and exclusive remedy, shall be entitled only to the amount due under the Subcontract as if the termination were for no fault as provided in this paragraph.

Regardless of whether termination of the Subcontract is for default or no-default, the Subcontractor shall not be entitled to any payment in excess of the reasonable value or actual cost of work actually performed by the Subcontractor in strict accordance with the Subcontract, less offsets and other amounts due the Contractor under the Subcontract, and the Subcontractor shall, in no event, be entitled to special, consequential, exemplary, or punitive damages because of the Contractor's termination of this Subcontract, the Contractor's alleged breach or default under this Subcontract, or any other act or omission of the Contractor.

**Section 12.**

Subcontractor is at all times and in all respects an independent contractor. No personnel employed by Subcontractor shall be deemed under any circumstances to be agents, representatives or employees of Contractor. The Subcontractor shall have no authority to bind the Contractor by any representation, promise, or statement of any kind without first obtaining the Contractor's specific written consent and authorization. The Subcontractor shall not interfere with the Contractor's relationship with the Owner or with other subcontractors. The Subcontractor shall not deal directly with either the Owner or the Architect without prior written authorization in each instance from the Contractor. The Subcontractor agrees not to enter into any other contract relating to this Project without the Contractor's prior written consent.

Revised 05/2010                          - 3 -                    Initial: Subcontractor ___ / Contractor ___

Carothers Construction, Inc.
Post Office Box 189
Taylor, MS 38673
Phone: 662-513-8820     Fax: 662-234-3292

CONTRACT NO. 512-038820
COST CODE: 07540-S

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

The Subcontractor has exclusive liability for all contributions, taxes, deposits, and payments required of employers by federal, state, or local governments, with respect to wages, salaries, remuneration, or benefits paid or owed by the Subcontractor to any of Subcontractor's employees or others who perform work or render services for Subcontractor in connection with this Subcontract. The Subcontractor has exclusive liability for all income, gross receipts, sales, use, or other taxes applicable to materials, equipment, labor, or performance of work pursuant to this Subcontract.

The Subcontractor shall comply with all laws, ordinances, building codes, safety requirements, and regulations of whatever nature that apply to this Subcontract and that are otherwise effective when and where the work under this Subcontract is to be performed.

Section 13.

The Subcontractor shall obtain, before commencement of work, full insurance coverage, including as a minimum the same types of insurance at the same policy limits which are specified by the Prime Contract or which the Contractor actually obtains for this Project, whichever are greater. All insurance coverages required hereunder shall be maintained for the duration of the Project and for as long thereafter as the Contractor is alleged to have liability. The Subcontractor is hereby made responsible for determining the types and extent of such additional insurance as may be necessary to give adequate and complete protection to the Subcontractor, the Contractor, and the Owner from claims for property damage and from claims for bodily injury, including death, which may arise from or be connected with this Subcontract, whether such claims relate to acts of omissions of Subcontractor, of any of its subcontractors or suppliers, or of anyone directly or indirectly employed by any of them. The Subcontractor's insurance shall be primary as to any insurance under which the Contractor is a named or additional insured or which otherwise extends coverage to the Contractor. The Subcontractor's insurance shall contain a standard cross-liability endorsement and a waiver of all rights of subrogation against the Contractor, Contractor's surety, and Contractor's insurers. The insurance protection and coverage provided hereunder by the Subcontractor for the Contractor's benefit shall not be restricted to the Subcontractor's indemnity obligations but are intended to extend to all claims, liability, or loss of whatever nature arising from or relating to this Subcontractor, to the Subcontract work, or to Subcontract obligations, regardless of the alleged liability or fault of any party indemnified under this Subcontract.

Simultaneously with execution of this Subcontract, the Subcontractor shall deliver Certificates of Insurance to the Contractor, certifying the types and the amounts of coverage, certifying that said insurance will be in force before Subcontractor starts work and continually thereafter for the time period required hereunder, and certifying that said insurance applies to all activities and liability of the Subcontractor pursuant to this Subcontract. No policy of insurance may be cancelled nor coverage reduced during the period of construction or the other times for which coverage is required hereunder; and the Subcontractor shall obtain an endorsement to its policies and insurance certificates prohibiting the insurer's cancellation or coverage reduction for a period of no less than thirty (30) days after the Contractor has acknowledged receipt of written notice of the insurer's intention to cancel or reduce the coverage.

The insurance and indemnity obligations of this Subcontract are nondelegable. The Subcontractor shall not sublet nor subcontract any part of this Subcontract without retaining absolute responsibility for requiring similar insurance from its subcontractors and suppliers. The Subcontractor's failure to maintain complete insurance shall be a material breach authorizing the Contractor, at the Contractor's sole election, either to terminate this Subcontract for default or to provide full insurance coverage at the Subcontractor's sole expense; however, in neither case shall the Subcontractor's liability be lessened. The Subcontractor's liability insurance policies shall each contain contractual insurance coverage (including but not limited to products liability and completed operations) so as to protect fully the Subcontractor, Contractor, and Owner.

With respect to builder's risk or any other type of insurance carried by the Contractor, the Owner, or other party which may inure to the benefit of the Subcontractor, the Subcontractor shall accept full responsibility for all deductibles and for any inadequacy or absence of coverage, and the Subcontractor shall have no claim or other recourse against the Contractor or against any other party for any costs or losses within insurance deductibles or otherwise uninsured because of coverage limitations, exclusions, or unavailability.

Section 14.

The Subcontractor covenants to defend, indemnify, save harmless, protect, and exonerate both the Contractor (its agents, employees, representatives, and sureties) and the Owner, jointly and severally, from any and all liability, claims, losses, suits, actions, demands, arbitrations, administrative proceedings, awards, judgments, expenses, attorneys' fees, and costs of whatever nature pertaining to economic loss or damages, labor disputes, safety requirements, performance or nonperformance of obligations, contracts, property rights of third parties, personal injury, bodily injury, death, or damage to or destruction of property (including the loss of use thereof) which are caused in whole or in part by the Subcontractor (herein defined to include but not be limited to the Subcontractor's owners, employees, agents, representatives, subcontractors, suppliers, contractees, and invitees), which arise from or are connected with work undertaken or to be performed by the Subcontractor, or which arise from or are connected with any other act or omission relating to the Subcontractor or to this Subcontract or to the Subcontract work. The foregoing covenants and indemnity obligation shall apply to the fullest extent permitted by law. The Subcontractor's indemnity obligations under this Subcontract shall not be restricted to amounts available under insurance, whether actually obtained or which should have been obtained.

Section 15.

The Subcontractor shall not subcontract nor assign any part of this Subcontract without first obtaining the written consent and approval of the Contractor.

Subcontractor shall not further subcontract any of the Subcontract Work without advance approval of the Contractor and only upon terms acceptable to the Contractor as to each sub-subcontract, purchase order, or similar agreement. Regardless of the numbers or extent of sub-subcontracts, the Subcontractor shall remain fully responsible for the overall management, supervision, scheduling, coordination, quality control, administrative requirements, and every other thing necessary for the complete and timely performance of the entire Subcontract Work and all obligations of this Subcontract. Among other things, the Subcontractor shall designate a project representative, satisfactory to the Contractor, who shall attend all subcontractor, scheduling, coordination, safety and other meetings at which the Subcontractor's attendance is requested, who shall receive all notices and communications (written, oral, or electronic) on behalf of the Subcontractor, and whose statements and actions shall be binding upon the Subcontractor.

Assignments of Subcontract proceeds are permissible but only if written notice of same is received and acknowledged in writing by a corporate officer of the Contractor at least thirty (30) days before the assigned proceeds are due and payable by the Subcontractor. The Subcontractor and the Subcontractor's assignee shall ensure that the assignment of Subcontract proceeds does not adversely affect the performance of this Subcontract, including the full and timely payment of all bills and obligations owed by the Subcontractor. To the extent Subcontract proceeds paid to the Subcontractor's assignee exceed funds made available by the assignee that are actually used to pay for

Revised 05/2010                                    - 4 -                    Initial: Subcontractor _____ Contractor _____

Carothers Construction, Inc.                    CONTRACT NO. 512-038820
Post Office Box 189                              COST CODE: 07540-S
Taylor, MS 38673
Phone: 662-513-8820        Fax: 662-234-3292

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

Subcontract work and materials, the Subcontractor and the Subcontractor's assignee hereby agree to indemnify, defend, save harmless, and exonerate the Contractor from any loss, liability, or expense (including attorneys' fees) which the Contractor incurs or which is claimed against either the Contractor or the Contractor's surety as a result of the Subcontractor's failure to perform work in accordance with the Subcontract or as a result of the Subcontractor's failure to pay its bills and discharge its obligations relating to this Subcontract. Any assignments of Subcontract proceeds and any payments made pursuant to assignments shall be subject to and conditioned upon the Subcontractor's compliance with all terms and conditions of this Subcontract, and any such assignments are expressly restricted to the amount actually collected by the Contractor from the Owner for work performed the Subcontractor and accepted by the Owner, less retainage, backcharges, or other offsets which are chargeable by the Contractor against the Subcontractor, whether on this Project or otherwise. Acknowledgment, acceptance, or approval of an assignment by the Contractor does not constitute any representation or agreement by the Contractor that the Subcontractor is owed the amount assigned or any specific amount whatsoever.

**Section 16.**

The Subcontractor shall have at least one competent nonworking superintendent present at the Project at all times work of Subcontractor is being performed or is scheduled to be performed. Said superintendent shall have absolute authority, in all respects, to act for and on behalf of the Subcontractor and to bind the Subcontractor. The Subcontractor shall replace said superintendent or any other employee, without additional charge, if so demanded by the Contractor. The Subcontractor shall do, without additional charge, whatever is necessary in the performance of this Subcontract or as the Contractor otherwise directs to assure harmonious labor relations at the Project and to prevent strikes or other labor disputes.

**Section 17.**

The Contractor may issue written change orders to this Subcontract, without notice to Subcontractor's sureties. Changes may be additive or deductive. The Subcontractor shall be obligated to perform in accordance with such change orders, and the Subcontract sum shall be adjusted as specified by such change order. No alterations or changes shall be made except upon the Contractor's written order, and changes to the Subcontract work are not valid and will not be recognized. The Subcontractor shall have no claim nor entitlement to payment for any addition to work or change in work unless, prior to commencement of performance, the Subcontractor receives a written change notice for such work at an agreed price from an authorized representative of the Contractor. Where changed work involves items shown on the Subcontractor's unit price schedule, the unit prices shall govern, unless mutually agreed in writing to the contrary.

The Subcontractor shall submit proposals for changes or alterations in the manner and time provided by the Prime Contract or as instructed by the Contractor. The Subcontractor shall provide such additional backup or breakdowns as may be requested by the Contractor. If the Subcontractor requests a written change order as provided herein but there is a dispute as to whether the item of work constitutes a change or the value of such change or any other matter in controversy, the Contractor shall be entitled to issue a directive to the Subcontractor to perform the disputed work, and the Subcontractor shall be obligated to proceed with and complete performance of the disputed work, without either party admitting to liability for the issues in dispute or waiving rights under this Subcontract. If the dispute is limited to the value of an admitted change, the Contractor agrees to pay, subject to all conditions precedent to payment in the Subcontract contained in Section 8 above, the Subcontractor's actual, documented direct costs of labor and material plus a reasonable allowance for overhead and profit; provided, however, that the Contractor shall not be obligated to pay any amount in excess of the amount the Contractor actually receives from the Owner on account of the Subcontractor's work. The Subcontractor shall keep and present, in such form as the Contractor may prescribe, an itemized accounting together with appropriate supporting data of direct labor and material costs actually incurred in performing such change order.

The Subcontractor shall give written notice of any claims for extra compensation, of whatever nature, at least five (5) working days prior to the time the Prime Contract requires the Contractor to give notice of same to the Owner. The Subcontractor shall be entitled to an increase in the Subcontract price and/or extension of the Subcontract time for changes in its work but only to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner for such changes. Such price adjustments and time extensions granted by the Owner and actually received by the Contractor on behalf of the Subcontractor shall be a condition precedent to any relief by the Subcontractor for changes or alterations in the work.

**Section 18.**

The Subcontractor shall keep its areas of operation on the Project in a neat and clean condition. The Subcontractor shall perform whatever cleaning is directed by the Contractor at no additional cost to the Contractor. Should the Subcontractor fail to do so promptly upon notice, the Contractor may, at its option, perform such cleanup at the Subcontractor's expense. Upon completion of various portions of its work, the Subcontractor shall broom clean its work areas and do whatever else is necessary to put its work in proper condition either for application or performance of follow-on work or for acceptance of Subcontract work.

The Subcontractor shall provide sufficient, safe and proper facilities, equipment, and working conditions, which shall at all times be subject to inspection by Contractor, the Owner, or their authorized representatives. The Subcontractor shall, within twenty-four hours after written notice from the Contractor, proceed to take down and remove from the premises of the Project all portions of the work and all material, which the Contractor shall deem as unsound or improper, or which fails to inform in any way to Prime Contract requirements. The Subcontractor shall make good all such disapproved work, equipment, and facilities and restore all other work damaged or destroyed in removing or making good such disapproved items, all at Subcontractor's sole risk and expense. However, Subcontractor shall not remove any other materials from the Project site without Contractor's written permission. Subcontractor agrees to abide by Contractor's decisions as to allotment of all storage and working space at the Project site and as to all other matters respecting the organization, flow, coordination, and sequencing of work. The Subcontractor shall not place signs of any kind upon the Project site without prior written approval of the Contractor.

**Section 19.**

Except as otherwise specifically provided therein, all claims, disputes, and other matters in controversy between the Contractor and the Subcontractor arising out of or relating to this Subcontract shall be decided by binding arbitration in accordance with the current and applicable Construction Industry Rules of the American Arbitration Association, unless the parties both agree to different rules and procedures. The sole exception to binding arbitration between the Contractor and Subcontractor is as follows: If the Contractor in good faith believes that any claim, dispute, or matter in controversy with the Subcontractor also involves rights or liabilities of the Owner, Architect, or other third party, then, at the Contractor's sole election, the Subcontractor agrees to resolve such issues in the same forum or proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some or all claims, disputes, and matters in controversy involving the Owner, Architect, or other third party so as to promote economy and avoid inconsistent results.

Revised 05/2010                    – 5 –        Initial: Subcontractor ___ / Contractor ___

Carothers Construction, Inc.           CONTRACT NO. 512-038820
Post Office Box 189                  COST CODE: 07540-S
Taylor, MS 38673
Phone: 662-513-8820    Fax: 662-234-3292

## STANDARD SUBCONTRACT OF CAROTHERS CONSTRUCTION, INC.

The Contractor and Subcontractor intend and agree that the foregoing dispute resolution provisions and rights of election given to the Contractor are not independent of nor severable from the remainder of the Subcontract and that such provisions and election rights are supported by the consideration and mutuality of the Subcontract as a whole. The locale for any arbitration or litigation involving the Subcontractor and the Contractor shall be Jackson, Mississippi, unless the Contractor agrees to designate another locale to facilitate joinder of parties, to consolidate claims, or for any other reason.

Should the Contractor through litigation, arbitration, or other means seek to recover on any surety bond given by the Subcontractor under this Subcontract, the Subcontractor and its surety, jointly and severally, agree to pay Contractor all costs, expenses, and attorneys' fees incurred in the investigation, preparation, and trial or hearing of such matters and otherwise reasonably related thereto.

If the Contractor and the Subcontractor litigate or arbitrate a monetary claim, not otherwise prohibited by this Subcontract, the party found liable in such proceedings will pay the other party's reasonable and necessary attorneys' fees. If less than the full amount of such monetary claim is awarded, the party asserting such claim ("claimant") shall recover reasonable and necessary attorneys' fees (but no contingent fees) equal to the proportion of the amount awarded to the amount claimed, and the claimant shall pay the other party's reasonable and necessary attorneys' fees (but no contingent fees) equal to the proportion of the amount denied to the amount claimed.

No claim, dispute, or matter in controversy or question shall interfere with the progress of construction, and the Subcontractor shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim, dispute, or matter in controversy or question.

Section 20.

All proposals, negotiations, and representations with respect to this Subcontract, whether oral or written, are hereby superseded and merged into this Subcontract. This Subcontract cannot be changed, modified, altered, suspended, or terminated, except in writing signed by an authorized representative of the Contractor. No delay, waiver, forbearance, or failure by the Contractor to exercise rights or remedies under this Subcontract or to insist upon strict compliance by the Subcontractor shall prevent the Contractor from strictly enforcing any of the provisions of this Subcontract, nor shall relieve the Subcontractor from strict compliance with all terms and conditions hereof nor shall waive, restrict, or adversely affect any of the Contractor's rights and remedies as to any subsequent or continuing failure of the Subcontractor to comply strictly with all terms and conditions of this Subcontract. The invalidity or unenforceability of any term or condition of this Subcontract shall not invalidate, render unenforceable, or adversely affect the remaining terms and conditions. The laws of the State where the Project is located shall govern the interpretation and enforceability of this Subcontract. The Subcontractor shall be liable for all damages, costs, and expenses, including attorneys' fees incurred by the Contractor in enforcing the terms and conditions of this Subcontract. This Subcontract shall be binding upon the successors in interest of the parties hereto; but nothing in this Subcontract is intended nor shall be construed to create any rights for or to benefit any third parties.

Section 21.

The Subcontractor's commencement of any performance of work on this project, including but not limited to the preparation of shop drawings and other submittals, shall constitute the agreement of both the Contractor and the Subcontractor that these Standard Terms and Conditions apply to this project and constitute a waiver by both parties of all objections to any of the Standard Terms and Conditions even if a Subcontract has not been fully executed at the time such work commences. The Contractor and Subcontractor further agree that the Standard Terms and Conditions of this Subcontract, Section 3-22, establish a course of dealing between them and shall apply to all future projects, unless before submitting a quotation for any future project, the Subcontractor gives the Contractor written notice of objection to specific Standard Terms and Conditions or unless before entering into a subsequent subcontract, the Contractor proposes different terms and conditions to the Subcontractor. Either the Contractor or Subcontractor will be entitled to specific performance of this provision with respect to this or future projects.

Section 22.

The Subcontractor shall obtain permission from the authorized representative of the Contractor before using any equipment, scaffolding, goods, materials, facilities, temporary installations, or other property owned, rented, provided, or made available by Contractor (herein "Contractor's property"). Subcontractor shall assume all risk and responsibility of independently verifying before each use that Contractor's property is correctly assembled, properly located, in good working order, safe, sufficient for purposes intended, and in compliance with all laws, rules, regulations, standards, guidelines, and regulations of governing authorities, applicable manufacturers, and best practices of the industry. Subcontractor shall permit only properly trained and appropriately qualified personnel to use Contractor's property and only in ways for which Contractor's property may be employed safely. Subcontractor shall discontinue use of Contractor's property immediately upon notice from the Contractor. SUBCONTRACTOR SHALL FULLY INDEMNIFY, HOLD HARMLESS, INSURE AND DEFEND THE CONTRACTOR FROM ANY AND ALL CLAIMS AND LIABILITY, OF WHATEVER KIND OR NATURE, WHICH ARISE FROM OR IN ANY WAY RELATE TO SUBCONTRACTOR'S USE OF CONTRACTOR'S PROPERTY, WHETHER OR NOT USED WITH CONTRACTOR'S PERMISSION, INCLUDING BUT NOT LIMITED TO ANY FINES OR PENALTIES IMPOSED AGAINST THE CONTRACTOR BY ANY GOVERNING AUTHORITY, LIKE OSHA, PERTAINING TO THE CONDITION OF CONTRACTOR'S PROPERTY OR THE SUBCONTRACTOR'S USE THEREOF.

IN WITNESS WHEREOF, authorized representatives of the parties hereto execute this Subcontract to be effective on the date first written above.

SEVEN HILLS CONSTRUCTION, LLC.           CAROTHERS CONSTRUCTION, INC.
(Subcontractor)                        (Contractor)

By: _____         By: _____

Title: _____       Title: David B. Smith, Purchasing

Date: 9/26/2014               Date: 09/23/2014

Revised 05/2010          -6-            Initial: Subcontractor ___ Contractor ___

ATTACHMENT "A" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC

SCOPE OF WORK

A)    GENERAL WORK SECTIONS:

1)    The Subcontractor shall furnish all labor, materials, tools, equipment, facilities, supervision, management, financing, services, shop drawings, submittals, testing, and every other thing of whatever nature necessary to fully perform and in every respect complete the work generally described as follows: Roofing System for the Project known as Army Reserve Center, Branford, CT, Contract No. W912QR-14-C-0024, RFP No. W912QR-14-R-0021 for all work in the Base Bid along with Options A, F and G.  The Subcontractor's work as generally described above shall be performed wherever required on the Project.

2)    The Subcontractor shall perform work in strict accordance with this Subcontract and with the Prime Contract, which is made a part hereof.   Anything pertaining to the Subcontractor's work that is mentioned in the specifications but not shown in the drawings, or shown in the drawings but not mentioned in the specifications, shall be of like effect as if shown or mentioned in both.  All work of the Subcontractor shall be subject to the approval of the Contractor, Architect, Owner, and any authorities having jurisdiction over the Subcontract work. The Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto, and it further includes everything reasonably necessary or customary for the proper execution, furnishing, connection, and completion of all work referred to by this Subcontract.

3)    Contract Documents dated 13 January 2014 (drawings) and 11 February 2014 (specifications), including Amendments No. 0001 dated 02/26/14, No. 0002 dated 04/21/14, No.003 dated 05/12/14, No.04 dated 07/02/14, and amendment No.005 dated 07/07/14 prepared by U.S. Army Corps of Engineers, Louisville District are made part of this Subcontract. Numerous special provisions are contained in the following that will describe and/or affect the Subcontractor's Scope of Work and Subcontractor is responsible for compliance with the same. All provisions below shall be strictly adhered to by the Subcontractor and are incorporated herein;

BRIDGEPORT ARMY RESERVE CENTER, BRANFORD, CT, CONTRACT NO. W912QR-14-C-0024

DIVISION 0     BIDDING REQUIREMENTS, Complete.
DIVISION 1     GENERAL REQUIREMENTS, Complete.

4)    This is a rated order certified for national defense. The contract for this project is assigned a priority rating of DO-C2 and the Subcontractor is required to follow all the provisions of the Defense Priorities and Allocations System regulation (15 CFR part 700). This rating and the required delivery date is to be included on all lower tier subcontracts and purchase orders issued by the Subcontractor to accomplish this contract.

5)    SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICE CONSTRUCTION CONTRACT is attached in EXHIBIT "1" and made part of this Subcontract.

6)    SUBCONTRACT SUPPLEMENT FOR FEDERAL SUBAWARD REPORTING SYSTEM is attached in EXHIBIT "2" and made part of this Subcontract.

7)    This Subcontract is subject to FAR 52.222-54, EMPLOYMENT ELIGIBILITY VERIFICATION and the Subcontractor is required to be enrolled as a Federal Contractor in E-Verify, to perform employee verification using E-Verify in accordance with FAR 52.222-54, and to incorporate FAR 52.222-54 EMPLOYMENT ELIGIBILITY VERIFICATION in all lower tier Subcontracts issued for this project with a Subcontract value of more than $3,000.00. Enrollment and employee verification directions and requirements for Federal Contractors are available on the Department of Homeland Security's website at http://www.dhs.gov/E-Verify.

8)    STATEMENT AND ACKNOWLEDGEMENT STANDARD FORM 1413 is attached and made part of this Subcontract.  The Subcontractor is required to complete the SF 1413 acknowledging compliance with the included clauses.

9)    Subcontractor understands and agrees that all work required by the Subcontract must be completed within reasonable durations, as established by the Contractor, that support the overall Construction Schedule. The Contractor will compile and distribute a working Construction Schedule that indicates all durations and relationships for each affected trade.  All trades are contractually bound by these durations and relationships, and must provide all labor, material, equipment, supervision and management required to maintain the Construction Schedule, without exception.

10)  The Subcontractor shall be responsible for stocking and hoisting materials as pertain to this Subcontract.

11)  The Subcontractor agrees to furnish, as a minimum the following insurance coverage for the durations and with the endorsements and other coverage requirements set out in Section 13 of the Subcontract;

Worker's Compensation / Employer's Liability: Minimum coverage of $100,000

Comprehensive General Liability: Combined single limit for bodily injury and property damage with a minimum limit of $1,000,000

Comprehensive Automobile Liability: Minimum limit of $1,000,000 per occurrence for bodily injury and property damage

Initial: Subcontractor _____  Contractor _____

ATTACHMENT "A" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC

SCOPE OF WORK

**Certificate of Insurance for General Liability and Automobile insurance is to show Carothers Construction, Inc. as additional insured and must identify the project by name and location. A Waiver of Subrogation is to be included for all policies on Subcontractor's Certificate of Insurance for Contractor, Contractor's Sureties and Contractor's Insurers.**

12) The Subcontractor agrees to provide all submittals as required no later than 20 days from the execution of this agreement or earlier if required by the Contractor's schedule.

B) SPECIFIC WORK SECTIONS:
   Applicable specification sections include but are not necessarily limited to:

   1)   SECTION 06 10 00       ROUGH CARPENTRY, Complete as it pertains to TPO roofs.
   2)   SECTION 07 22 00       ROOF AND DECK INSULATION, Complete as it pertains to TPO roofs.
   3)   SECTION 07 25 00.00 06 BUILDING AIR BARRIER SYSTEM, Complete as it pertains to TPO roofs.
   4)   SECTION 07 54 19.00 48 THERMOPLASTIC MEMBRANE ROOFING SYSTEM, Complete.
   5)   SECTION 07 62 00.00 48 FLASHING AND SHEET METAL, Complete as it pertains to TPO roofs.
   6)   SECTION 07 72 33       ROOF ACCESSORIES, Complete as it pertains to TPO roofs.
   7)   SECTION 07 92 00.00 48 JOINT SEALANTS, Complete as it pertains to TPO roofs.

**The foregoing listing of specification sections (or other provisions of the Prime Contract) is intended to be illustrative only and not necessarily complete. Subcontractor is responsible for locating and complying with all Contract Documents which specify, indicate, or affect performance of Subcontractor's general scope of work regardless of whether included in the listed specification sections.**

C) CLARIFICATIONS:

   1) Includes furnishing and installation of all thermoplastic membrane roofing and related work as required by and in accordance with the project documents for the Training Center Building and if later awarded by change order for the OMS Building.
   2) The work includes but is not limited to:
      a. Complete membrane roofing system including underlayment board, air/water barrier, roof insulation, coverboard, and TPO membrane at roof, parapet wall, and high/low wall surfaces.
      b. All roofing related sheet metal including but not limited to flashings, caps, copings, scuppers, and downspouts.
      c. All flashings/counter flashings at roof penetrations, vents, and roof equipment curbs.
      d. Roof hatch and associated safety railing system.
      e. All walk pads.
      f. All roof related rough (wood) carpentry and blocking at membrane roofing and coping systems.
      g. All means, methods, and equipment required for performance of work.
   3) Includes roof installation based on wind uplift requirements.
   4) Includes all warranties per the specifications.
   5) Includes all unloading, storage, and protection of roofing materials.
   6) Includes 100% Performance and Payment Bonds from Treasury listed surety in a form acceptable to Contractor to be received on or before December 31, 2014.
   7) Shop drawings, manufacturer's information, samples, etc. as required are to be submitted on all products and approval received prior to fabrications. ALL SUBMITTALS ARE TO BE SENT TO THE JOBSITE OFFICE.
   8) Government Award of Options- The Government has the right to award the following Contract Options within 210 days of contract award. Subcontractor agrees to honor the following Pricing for these options for this duration. Upon award of these options by the government a Change Order will be issued to Subcontractor to exercise said Option work.

| Option | Description | Amount |
|--------|-------------|--------|
| Option 'N' – OMS Building | TPO roofing system and related work. | $76,946.00 |

D) EXCLUSIONS:

   1) Sales tax on materials incorporated into the project.
   2) Mechanical/electrical connects, disconnects, and equipment handling.
   3) Elevated, galvanized steel equipment frames.
   4) Metal roof system associated with metal buildings.
   5) Metal wall panel system.

E) REVISIONS TO STANDARD SUBCONTRACT TERMS AND CONDITIONS:

   1) Section 4, 1st paragraph: DELETE the following sentence "Furthermore, the Subcontractor shall pay the Contractor's acceleration costs, extended job site overhead, unabsorbed home office overhead, and all other direct and indirect expenses of whatever nature, including attorneys' fees, caused in whole or in part by delays, disruptions, or other reasons attributable to the Subcontractor".

   2) Section 8, Fourth Paragraph: Delete requirement for retainage, provided satisfactory Performance and Payment bonds are received from subcontractor.

Initial: Subcontractor _____ Contractor _____

- 2 -

ATTACHMENT "A" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC

SCOPE OF WORK

3)  Section 10, 2nd paragraph:  CHANGE the paragraph to read in its entirety "The Subcontractor hereby agrees that the Contractor has the right to pay any bills or past due obligations of the Subcontractor arising on this Project, including backcharges owed to the Contractor.  Prior to paying bills of the Subcontractor the Contractor will give the Subcontractor written notification and allow at least five (10) days for the Subcontractor to pay such obligations or to dispute their validity.  Any such payments made by the Contractor, whether by joint check, direct payment, offset or otherwise, shall apply as a payment of earned proceeds (exclusive of retainage) on this Subcontract.  Any decision made by the Contractor pursuant to this paragraph shall be subject to review under the dispute procedures herein".

4)  Section 11, 1st paragraph:  CHANGE the paragraph to read in its entirety "Should the Subcontractor, at any time, refuse, neglect, or fail:  to furnish and maintain sufficient labor, material, equipment, services, or supervision; or to pay for labor, equipment or material furnished to or used by the Subcontractor; or to prosecute the work covered by this Subcontract with promptness and diligence so as not to delay either work of others or the Project as a whole; or to perform any term or condition of this Subcontract, all of which are considered material; then upon any one of these events and provided Subcontractor was first served with prior written notice and an opportunity to cure of at least five (5) days, the Contractor may, at its option, after notice to Subcontractor, do one or more of the following:  (1) supplement the Subcontractor with labor, material, and equipment; or (2) terminate this Subcontract in whole or in part and complete the Subcontract with the Contractor's own forces or with others; or (3) issue a deductive change to eliminate portions of the Subcontract work; or (4) take any other action which the Contractor in good faith deems reasonable under the circumstances.  In the event of any failure or inadequacy of performance by the Subcontractor, the Subcontractor shall be liable to the Contractor as outlined by language in the performance and payment bonds provided.

5)  Section 11, 2nd paragraph:  CHANGE the last sentence to read "If the charges, losses, expenses, attorneys' fees, and damages sustained by the Contractor in completing the Subcontract work or otherwise attributable to Subcontractor's performance delays or failures exceed the unpaid portion of the Subcontract amount, the Subcontractor shall pay the difference to Contractor within 90 days after demand for same by Contractor".

6)  Section 19, 2nd paragraph:  CHANGE the second sentence to read "The locale for any arbitration involving the Subcontractor and the Contractor shall be at a mutually agreed location".

| Provide the following for Federal Reporting and as a requirement of this Subcontract? Check the appropriate box | | |
|---|---|---|
| ☐ Large Business | OR | ☒ Small Business |

| If Small Business, check all appropriate boxes: | |
|---|---|
| ☐ Small Disadvantaged Business (SDB) | ☐ Historically Underutilized Business Zone Small Business (HUBZone) |
| ☐ Woman-Owned Small Business (WOSB) | ☒ Service Disabled Veteran-Owned Small Business (SDVOSB) |
| | ☐ Veteran-Owned Small Business (VOSB) |

SEVEN HILLS CONSTRUCTION, LLC                    CAROTHERS CONSTRUCTION, INC.

BY: _____                    BY: _____

TITLE: Chief Operating Officer                    TITLE:  David B. Smith, Purchasing

DATE: 9/26/2014                                   DATE: 09/23/2014

                                                  Initial: Subcontractor ____ / Contractor ____

-3.-

EXHIBIT "1" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC.

**SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICED CONSTRUCTION CONTRACT**

1.    This Subcontract Supplement applies if the Project is a fixed-price construction contract between Carothers Construction, Inc. ("Contractor") and an agency or instrumentality of the Federal Government. The contract between Contractor and the Federal Government shall be referred to as the "Federal Prime Contract".

2.    The Subcontractor shall be bound to the Contractor to the same extent that the Contractor is bound to the Federal Government under the terms of the Federal Prime Contract, including requirements of the Federal Acquisition Regulations ("FAR"), other regulations, and statutes.  The Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Federal Prime Contract, assumes toward the Government, and the Subcontractor shall have the benefit of all rights, remedies, and redress against the Contractor which the Contractor, under the Federal Prime Contract, has against the Government.  Similarly, the Contractor shall be bound to the Subcontractor by the Terms of this Subcontract and by the terms of the Federal Prime Contract between the Contractor and the Government, including the FAR, other regulations, and statutes, insofar as it applicable to the Subcontractor, the Subcontract, and the Subcontract Work.  The Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Government, by the Federal Prime Contract, assumes toward the Contractor, and the Contractor shall have the benefit of all rights, remedies, and redress against the Subcontractor which the Government, under the Federal Prime Contract, has against the Contractor. If the terms and conditions of the Federal Prime Contract, including FAR clauses and other regulatory requirements, are revised by the Government, then such revisions and modifications govern and apply to this Subcontract to the same extent as they apply to the Federal Prime Contract.

3.    If the Project is a Federal Government project, the term "Owner" in the Subcontract shall mean an agency, department, or instrumentality of the United States of America, acting through one or more Contracting Officers, with whom the Contractor has entered into the Federal Prime Contract. The term "Architect" shall mean all authorized representatives of the Contracting Officer with responsibility for design, inspection, approval, or acceptance of Contractor's work and of the Subcontract Work.

4.    When the Federal Prime Contract requires the Contractor to give notice to the Government upon the occurrence of specified events and the Subcontractor knows or has reason to know that one or more specified events have occurred, the Subcontractor shall give the Contractor written notice of such events immediately and, in any case, in sufficient time to allow the Contractor to timely give the Government any required notice.  The Subcontractor's notice shall contain all information the Subcontractor has or can reasonably obtain to enable the Contractor to comply fully with the informational and notice requirements imposed upon the Contractor by the Government.  The Subcontractor's failure to give adequate or timely notice or otherwise to meet the requirements of the Federal Prime Contract shall waive, limit, and bar the Subcontractor's right to any adjustment of time or amount to the extent the Contractor's adjustment of time or amount from the Government is deemed to have been waived, limited, or barred by inadequate or untimely notice attributable to the Subcontractor's failure to comply with this clause.

5.    Irrespective of the place of performance, the provisions of contract clauses in the Federal Prime Contract, incorporated into the Subcontract, will be construed and interpreted according to the federal common law of government contracts as enunciated and applied by federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the federal government.  To the extent that the federal common law of government contracts is not dispositive or other clauses are in dispute, the laws of the state where the Project is located shall apply.

6.    The Subcontractor hereby represents that it is familiar with and assumes all risk of clauses and requirements imposed by the Federal Acquisition Regulations with respect to the Federal Prime Contract, which are incorporated by reference into and made an integral part of this Subcontract.

In furtherance of and without limitation upon the general incorporation by reference of all terms and conditions of the Federal Prime Contract into this Subcontract, some typical provisions of Federal Prime Contracts are set forth hereafter for the benefit of the Subcontractor's information.  The following clauses may or may not be set out in full text in the Federal Prime Contract but the Subcontractor is nonetheless bound to the Contractor to the extent these clauses are deemed to be incorporated into the Federal Prime Contract either by reference or by operation of law. The following clauses apply to this Subcontract to the extent they apply to or govern the Federal Prime Contract as if the full text of each clause were stated verbatim in the Subcontract, with the exception that in these clauses the words "Government", "Contracting Officer", or words of similar import indicating an agency or representative of the Government shall all be changed to read "Contractor"; the word "Contractor" shall be changed to read "Subcontractor"; the word "Contract" shall be changed to read "Subcontract"; and the word "Subcontractor" shall mean a sub-subcontractor, material supplier of the Subcontractor, or other contractee of the Subcontractor.

| FAR | 52.202-1 | DEFINITIONS (JULY 2012) |
| FAR | 52.203-3 | GRATUITIES (APR 1984) |
| FAR | 52.203-5 | COVENANT AGAINST CONTINGENT FEES (APR 1984) |
| FAR | 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (SEP 2006) |
| FAR | 52.203-7 | ANTI-KICKBACK PROCEDURES (JUL 2010) |
| FAR | 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| FAR | 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| FAR | 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (OCT 2010) |

Initial: Subcontractor _____ Contractor _DSS_

-1-

EXHIBIT "1" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC.

**SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICED CONSTRUCTION CONTRACT**

| | | |
|---|---|---|
| FAR | 52.203-13 | CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (APR 2010) |
| FAR | 52.203-14 | DISPLAY OF HOTLINE PISISTER(S) (DEC 2007) |
| FAR | 52.204-4 | PRINTING OR COPIED DOUBLE-SIDED ON POSTCONSUMER FIBER CONTENT PAPER (MAY 2011) |
| FAR | 52.204-6 | DATA UNIVERSAL NUMBERING SYSTEM NUMBER (JULY 2013) |
| FAR | 52.204-7 | SYSTEM FOR AWARD MANAGEMENT (JUL 2013) |
| FAR | 52.204-9 | PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL (JAN 2011) |
| FAR | 52.204-10 | REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS (AUG 2012) |
| FAR | 52.209-6 | PROTECTING THE GOVERNMENTS INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (DEC 2010) |
| FAR | 52.211-1 | AVAILABILITY OF SPECIFICATIONS LISTED IN THE GSA INDEX OF FEDERAL SPECIFICATIONS, STANDARDS AND COMMERCIAL ITEM DESCRIPTIONS, FPMR PART 101 29 (AUG 1998) |
| FAR | 52.211-2 | AVAILABILITY OF SPECIFICATIONS, STANDARDS, AND DATA ITEM DESCRIPTIONS LISTED IN THE ACQUISITION STREAMLINING AND STANDARDIZATION INFORMATION SYSTEM (ASSIST) (JAN 2006) |
| FAR | 52.211-6 | BRAND NAME OR EQUAL (AUG 1999) |
| FAR | 52.211-10 | COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) |
| FAR | 52.211-12 | LIQUIDATED DAMAGES-CONSTRUCTION (SEP 2000) |
| FAR | 52.211-13 | TIME EXTENSIONS (SEP 2000) |
| FAR | 52.211-14 | NOTICE OF PRIORITY RATING FOR NATIONAL DEFENSE, EMERGENCY PREPAREDNES AND ENERGY PROGRAM USE (APR 2008) |
| FAR | 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS (APR 2008) |
| FAR | 52.215-1 | INSUTRUCTIONS TO OFFERERS – COMPETITIVE ACQUISTIONS (JAN 2004) |
| FAR | 52.215-2 | AUDIT AND RECORDS-NEGOTIATION (OCT 2010) |
| FAR | 52.215-11 | PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA – MODIFICATIONS (AUG 2011) |
| FAR | 52.215-13 | SUBCONTRACTOR CERTIFIED COST OR PRICING DATA – MODICATIONS (OCT 2010) |
| FAR | 52.215-15 | PENSION ADJUSTMENTS AND ASSET REVERSIONS (OCT 2010) |
| FAR | 52.215-17 | WAIVER OF FACILITIES CAPITAL COST OF MONEY (OCT 1997) |
| FAR | 52.215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB) OTHER THAN PENSIONS (JUL 2015) |
| FAR | 52.215-19 | NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997) |
| FAR | 52.215-21 | REQUIREMENTS FOR COST OR PRICING DATA OR INFORMATION OTHER THAN COST OR PRICING DATA-MODIFICATIONS (OCT 1997) |
| FAR | 52.216-1 | TYPE OF CONTRACT (APR 1984) |
| FAR | 52.217-5 | EVALUATION OF OPTIONS (JUL 1990) |
| FAR | 52.219-8 | UTILIZATION OF SMALL BUSINESS CONCERNS (JULY 2013) |
| FAR | 52.219-9 | SMALL BUSINESS SUBCONTRACTING PLAN (JULY 2013) |
| FAR | 52.219-16 | LIQUIDATED DAMAGES-SUBCONTRACTING PLAN (JAN 1999) |
| FAR | 52.222-1 | NOTICE TO THE GOVERNMENT OF LABOR DISPUTES (FEB 1997) |
| FAR | 52.222-3 | CONVICT LABOR (JUN 2003) |
| FAR | 52.222-4 | CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION (JUL 2005) |
| FAR | 52.222-5 | DAVIS-BACON ACT – SECONDARY SITE OF THE WORK (JUL 2005) |
| FAR | 52.222-6 | DAVIS-BACON ACT (JUL 2005) |
| FAR | 52.222-7 | WITHHOLDING OF FUNDS (FEB 1988) |
| FAR | 52.222-8 | PAYROLLS AND BASIC  RECORDS (JUN 2010) |
| FAR | 52.222-9 | APPRENTICES AND TRAINEES (JUL 2005) |
| FAR | 52.222-10 | COMPLIANCE WITH COPELAND ACT REQUIREMENTS (FEB 1988) |
| FAR | 52.222-11 | SUBCONTRACTOR (LABOR STANDARDS) (JUL 2005) |
| FAR | 52.222-12 | CONTRACT TERMINATION-DEBARMENT (FEB 1988) |
| FAR | 52.222-13 | COMPLIANCE WITH DAVIS-BACON AND RELATED ACT REGULATIONS (FEB 1988) |
| FAR | 52.222-14 | DISPUTES CONCERNING LABOR STANDARDS (FEB 1988) |
| FAR | 52.222-15 | CERTIFICATION OF ELIGIBILITY (FEB 1988) |
| FAR | 52.222-21 | PROHIBITION OF SEGREGATED FACILITIES (FEB 1999) |
| FAR | 52.222-23 | NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE EQUAL EMPLOYMENT OPPORTUNITY FOR CONSTRUCTION (FEB 1999) |

*(a)  The offeror's attention is called to the Equal Opportunity Clause and the Affirmative Action Compliance Requirements for Construction clause of this solicitation.   (b)  The goals for minority and female participation, expressed in percentage terms for the Contractor's aggregate workforce in each trade on all construction work in the covered area, are as follows;*
*Goals for Minority Participation for Each Trade – 9.0%*
*Goals for Female Participation for Each Trade – 6.9%*

Initial:  Subcontractor _____  Contractor _____

-2-

EXHIBIT "I" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC.

SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICED CONSTRUCTION CONTRACT

These goals are applicable to all the Contractor's construction work performed in the covered area. If the Contractor performs construction work in a geographical area located outside of the covered area, the Contractor shall apply the goals established for the geographical area where the work is actually performed. Goals are published periodically in the Federal Register in notice form, and these notices may be obtained from any Office of Federal Contract Compliance Programs office. (c ) The Contractor's compliance with Executive Order 11246, as amended, and the regulations in 41 CFR 60-4 shall be based on (1) its implementation of the Equal Opportunity clause, (2) specific affirmative action obligations required by the clause entitled "Affirmative Action Compliance Requirements for Construction," and (3) its efforts to meet the goals. The hours of minority and female employment training must be substantially uniform throughout the length of the contract, and in each trade. The Contractor shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from Contractor to Contractor, or from project to project for the sole purpose of meeting the Contractor's goals shall be a violation of the contract, Executive Order 11246, as amended, and the regulations in 41 CFR 60-4. Compliance with the goals will be measured against the total work hours performed. (d) The Contractor shall provide written notification to the Deputy Assistant for Federal Contract Compliance, U.S. Department of Labor, within 10 working days following award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the – (1) Name, address, and telephone number of the subcontractor; (2) Employer's identification number of the subcontractor; (3) Estimated dollar amount of the subcontract; (4) Estimated starting and completion dates of the subcontract; and (5) Geographical area in which the subcontract is to be performed. (e)   As used in this Notice, and any contract resulting from this solicitation, the "covered area" is PA Cumberland, PA Dauphin, PA Perry.

*(End of Provision)*

| | | |
|---|---|---|
| FAR | 52.222-26 | EQUAL OPPORTUNITY (MAR 2007) |
| FAR | 52.222-27 | AFFIRMATIVE ACTION COMPLIANCE REQUIREMENTS FOR CONSTRUCTION (FEB 1999) |
| FAR | 52.222-35 | EQUAL OPPORTUNITY FOR VETERANS (SEP 2010) |
| FAR | 52.222-36 | AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (OCT 2010) |
| FAR | 52.222-37 | EMPLOYMENT REPORTS ON VETERANS (SEP 2010) |
| FAR | 52.222-40 | NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT (DEC 2010) |
| FAR | 52.222-50 | COMBATING TRAFFICKING IN PERSONS (FEB 2009) |
| FAR | 52.222-54 | EMPLOYMENT ELIGIBILITY VERIFICATION (JUL 2012) |
| FAR | 52.223-5 | POLLUTION PREVENTION AND RIGHT-TO-KNOW INFORMATION (MAY 2011) |
| FAR | 52.223-6 | DRUG-FREE WORKPLACE (MAY 2011) |
| FAR | 52.223-10 | WASTE REDUCTION PROGRAM (MAY 2011) |
| FAR | 52.223-18 | ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE DRIVING (AUG 2011) |
| FAR | 52.225-11 | BUY AMERICAN ACT-CONSTRUCTION MATERIALS UNDER TRADE AGREEMENTS (NOV 2012) |
| FAR | 52.225-12 | NOTICE OF BUY AMERICAN ACT REQUIREMENT-CONSTRUCTION MATERIALS UNDER TRADE AGREEMENTS (FEB 2009) |
| FAR | 52.227-1 | AUTHORIZATION AND CONSENT (DEC 2007) |
| FAR | 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (DEC 2007) |
| FAR | 52.228-2 | ADDITIONAL BOND SECURITY (OCT 1997) |
| FAR | 52.228-5 | INSURANCE-WORK ON A GOVERNMENT INSTALLATION (JAN 1997) |
| FAR | 52.228-11 | PLEDGES OF ASSETS (JAN 2012) |
| FAR | 52.228-12 | PROSPECTIVE SUBCONTRACTOR REQUESTS FOR BONDS (OCT 1995) |
| FAR | 52.228-14 | IRREVOCABLE LETTER OF CREDIT (DEC 1999) |
| FAR | 52.228-15 | PERFORMANCE AND PAYMENT BONDS-CONSTRUCTION (OCT 2010) |
| FAR | 52.229-3 | FEDERAL, STATE, AND LOCAL TAXES (APR 2003) |
| FAR | 52.232-5 | PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) |
| FAR | 52.232-16 | PROGRESS PAYMENTS (APR 2012) |
| FAR | 52.232-17 | INTEREST (OCT 2010) |
| FAR | 52.232-23 | ASSIGNMENT OF CLAIMS (JAN 1986) |
| FAR | 52.232-27 | PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (OCT 2008) |
| FAR | 52.233-1 | DISPUTES (JUL 2002) |
| FAR | 52.233-2 | SERVICE OF PROTEST (SEP 2006) |
| FAR | 52.233-3 | PROTEST AFTER AWARD (AUG 1996) |
| FAR | 52.233-4 | APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM (OCT 2004) |
| FAR | 52.236-1 | PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984) |
| FAR | 52.236-2 | DIFFERING SITE CONDITIONS (APR 1984) |
| FAR | 52.236-3 | SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) |

Initial:  Subcontractor _____ Contractor _____

**EXHIBIT "1" TO SUBCONTRACT NO. 512-038820**
**BETWEEN**
**CAROTHERS CONSTRUCTION, INC.**
**AND**
**SEVEN HILLS CONSTRUCTION, LLC.**

**SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICED CONSTRUCTION CONTRACT**

| | | |
|---|---|---|
| FAR | 52.236-4 | PHYSICAL DATA (APR 1984) |
| FAR | 52.236-5 | MATERIAL AND WORKMANSHIP (APR 1984) |
| FAR | 52.236-6 | SUPERINTENDENCE BY THE CONTRACTOR (APR 1984) |
| FAR | 52.236-7 | PERMITS AND RESPONSIBILITIES (NOV 1991) |
| FAR | 52.236-8 | OTHER CONTRACTS (APR 1984) |
| FAR | 52.236-9 | PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS (APR 1984) |
| FAR | 52.236-10 | OPERATIONS AND STORAGE AREAS (APR 1984) |
| FAR | 52.236-11 | USE AND POSSESSION PRIOR TO COMPLETION (APR 1984) |
| FAR | 52.236-12 | CLEANING UP (APR 1984) |
| FAR | 52.236-13 | ACCIDENT PREVENTION (NOV 1991) |
| FAR | 52.236-15 | SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984) |
| FAR | 52.236-21 | SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) |
| FAR | 52.236-25 | REQUIREMENTS FOR REGISTRATION OF DESIGNERS (JUN 2003) |
| FAR | 52.236-26 | PRECONSTRUCTION CONFERENCE (FEB 1995) |
| FAR | 52.236-27 | SITE VISIT (CONSTRUCTION) (FEB 1995) – ALTERNATE I (FEB 1995) |
| FAR | 52.236-28 | PREPERATION OF PROPOSALS -- CONSTRUCTION (OCT 1997) |
| FAR | 52.242-13 | BANKRUPTCY (JUL 1995) |
| FAR | 52.242-14 | SUSPENSION OF WORK (APR 1984) |
| FAR | 52.243-4 | CHANGES (JUN 2007) |
| FAR | 52.246-12 | INSPECTION OF CONSTRUCTION (AUG 1996) |
| FAR | 52.246-21 | WARRANTY OF CONSTRUCTION (MAR 1994) – ALTERNATE I (APR 1984) |
| FAR | 52.248-3 | VALUE ENGINEERING-CONSTRUCTION (OCT 2010) |
| FAR | 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) (APR 2012) ALTERNATE I (SEPT 1996) |
| FAR | 52.249-10 | DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) |
| FAR | 52.253-1 | COMPUTER GENERATED FORMS (JAN 1991) |
| DFARS | 252.201-7000 | CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) |
| DFARS | 252.203-7000 | REQUIREMENTS RELATING TO COMPENSATION OF FORMER DOD OFFICIALS (SEP 2011) |
| DFARS | 252.203-7001 | PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER DEFENSE-CONTRACT-RELATED FELONIES (DEC 2008) |
| DFARS | 252.203-7002 | REQUIRMENT TO INFORM EMPLOYEES OF WHISTLEBLOWER RIGHTS (JAN 2009) |
| DFARS | 252.203-7005 | REPRESENTATION RELATING TO COMPENSATION OF FORMER DOD OFFICIALS (NOV 2011) |
| DFARS | 252.204-7004 | CENTRAL CONTRACTOR REGISTRATION, ALTERNATE A (SEP 2007) |
| DFARS | 252.205-7000 | PROVISION OF INCRAMATION TO COOPERATIVE AGREEMENT HOLDERS (DEC 1991) |
| DFARS | 252.209-7004 | SUBCONTRACTING WITH FIRMS THAT ARE OWNED OR CONTROLLED BY THE GOVERNMENT OF A TERRORIST COUNTRY (DEC 2006) |
| DFARS | 252.215-7000 | PRICING ADJUSTMENTS (DEC 1991) |
| DFARS | 252.219-7003 | SMALL BUSINESS SUBCONTRACTING PLAN (DOD CONTRACTS) (AUG 2012) |
| DFARS | 252.223-7004 | DRUG FREE WORK FORCE (SEPT 1988) |
| DFARS | 252.223-7006 | PROHIBITION ON STORAGE AND DISPOSAL OF TOXIC AND HAZARDOUS MATERIALS (APR 2012) |
| DFARS | 252.226-7001 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES, AND NATIVE HAWAIIAN SMALL BUSINESS CCONCERNS |
| DFARS | 252.227-7025 | LIMITATIONS ON THE USE OR DISCLOSURE OF GOVERNMENT-FURNISHED INFORMATION MARKED WITH RESTRICTIVE LEGENDS (MAY 2013) |
| DFARS | 252.227-7033 | RIGHTS IN SHOP DRAWINGS (APR 1966) |
| DFARS | 252.232-7003 | ELECTRONIC SUBMISSION OF PAYMENT REQUESTS AND RECEIVING REPORTS (JUN 2012) |
| DFARS | 252.232-7010 | LEVIES ON CONTRACT PAYMENTS (DEC 2006) |
| DFARS | 252.236-7000 | MODIFICATION PROPOSALS - PRICE BREAKDOWN (DEC 1991) |
| DFARS | 252.236-7001 | CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000) |
| DFARS | 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS (DEC 1991) |
| DFARS | 252.243-7002 | REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) |

The foregoing clauses are illustrative and not necessarily all-inclusive. The Subcontractor shall be bound by all terms, conditions, specifications, and requirements of the Federal Prime Contract to the same extent that the Contractor is bound to the Federal Government, regardless of whether listed as one of the clauses above.

7.    If the Federal Prime Contract includes the clause entitled Prompt Payment for Construction Contracts, FAR 52.232-27 (OCT 2008), the Contractor shall pay Subcontractor for satisfactory performance under the Subcontract no later than seven (7) days from Contractor's receipt of payment from the Government but only to the extent of such amounts actually received by the Contractor from the Government for the Subcontractor's work, less any amounts the Contractor may be entitled to withhold under other terms and conditions of the Subcontract, including but not limited to the Subcontractor's failure to perform all work in strict accordance with the Federal Prime Contract. The Contractor's receipt of payment from the Government shall remain a condition precedent to the Contractor's obligation to make payment to the Subcontractor.

-4-

Initial: Subcontractor _____ Contractor 035

EXHIBIT "1" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC.

SUBCONTRACT SUPPLEMENT FOR FEDERAL GOVERNMENT FIXED-PRICED CONSTRUCTION CONTRACT

Subject to the foregoing, the Contractor shall pay the Subcontractor interest at Treasury circular rates for each Subcontract payment not made in accordance with this payment clause for the period beginning on the day after the required payment date and ending on the date on which payment of the amount due is made.

The Subcontractor shall include a payment clause and interest penalty clause conforming to the foregoing requirements in each of its subcontracts and purchase orders for property and services related to performance of the Subcontract. The Subcontractor shall further require each of its subcontractors and material suppliers to include such clauses in agreements with each lower-tier subcontractor or supplier.

8.      The intent of this Subcontract Supplement is to impose any and all responsibilities upon the Subcontractor with respect to the Subcontract Work to the same extent as required of the Contractor by the Federal Prime Contract. This Subcontract Supplement shall not enlarge Subcontractor's right against the Contractor beyond the terms of the Subcontract. In no event shall the Subcontractor be entitled to any payment from or relief against the Contractor beyond the payments or relief actually obtained by the Contractor from the Government on behalf of the Subcontractor.

SEVEN HILLS CONSTRUCTION, LLC.

BY: _____

TITLE: _____

DATE: 9/26/2014

CAROTHERS CONSTRUCTION, INC.

BY: _____

TITLE: David E. Smith, Purchasing

DATE: 09 / 23 / 2014

Initial: Subcontractor _____ Contractor DES

-5-

EXHIBIT "2" TO SUBCONTRACT NO. 512-038820
BETWEEN
CAROTHERS CONSTRUCTION, INC.
AND
SEVEN HILLS CONSTRUCTION, LLC.

SUBCONTRACT SUPPLEMENT FOR FEDERAL SUBAWARD REPORTING SYSTEM

1.  This Subcontract is subject to FAR 52.204-10 REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS.

2.  The Subcontractor is required upon award of a subcontract with a value of $25,000 or more to provide the Contractor with the information required by FAR 52.204-10 necessary for the Contractor to comply with the reporting requirements of the Federal Funding Accountability and Transparency Act of 2006 unless the Subcontractor in the previous tax year had gross income from all sources under $300,000.

3.  The Contractor is required to report the following information as pertains to the Subcontractor:
    a.  Unique identifier (DUNS Number) for the subcontractor receiving the award and for the subcontractor's parent company, if the subcontractor has a parent company.
    b.  Name of the subcontractor.
    c.  Amount of the subcontract award.
    d.  Date of the subcontract award.
    e.  A description of the products or services (including construction) being provided under the subcontract, including the overall purpose and expected outcomes or results of the subcontract.
    f.  Subcontract number (the subcontract number assigned by the Contractor).
    g.  Subcontractor's physical address including street address, city, state, and country. Also include the nine-digit zip code and congressional district.
    h.  Subcontractor's primary performance location including street address, city, state, and country. Also include the nine-digit zip code and congressional district.
    i.  The prime contract number, and order number if applicable.
    j.  Awarding agency name and code.
    k.  Funding agency name and code.
    l.  Government contracting office code.
    m.  Treasury account symbol (TAS) as reported in FPDS.
    n.  The applicable North American Industry Classification System code (NAICS).

4.  The Contractor is also required to report by the end of the month following the month of a first-tier subcontract award with a value of $25,000 or more, and annually thereafter, the names and total compensation of each of the five most highly compensated executives for each first-tier subcontractor for the subcontractor's preceding completed fiscal year if in the subcontractor's preceding fiscal year, the subcontractor received:
    a.  80 percent or more of its annual gross revenues from Federal contracts (and subcontracts), loans, grants (and subgrants) and cooperative agreements; and
    b.  $25,000,000 or more in annual gross revenues from Federal contracts (and subcontracts), loans, grants (and subgrants) and cooperative agreements.

5.  The Subcontractor acknowledges and agrees they will provide the required reporting information within fourteen (14) days of receipt of the Subcontract.

6.  Complete Charts A and B as applicable to determine if the Contractor is required to report award of subcontract to the Subcontractor and to determine if the Subcontractor is required to provide the names and total compensation of each of Subcontractor's five most highly compensated executives.
    a.  If Subcontractor checks the $300,000 or more box in Chart A below complete and return to the Contractor the "Subcontractor Provided Information" form.   If Subcontractor checks the less than $300,000 box the "Subcontractor Provided Information" form is not required to be completed.
    b.  If Subcontractor checks the 80% or more and the $25,000,000 or more boxes in Chart B below provide the names and total compensation of each of Subcontractor's five most highly compensated executives as part of completing the "Subcontractor Provided Information" form.  If Subcontractor checks any other combination of boxes in Chart B submittal of the names and compensation is not required.

| A.  Subcontractor's gross income from all sources for previous tax year.  Check the appropriate box. | | |
|---|---|---|
| ☒ Less than $300,000 | OR | ☐ $300,000 or more |

| B.  Subcontractor's annual gross revenues for preceding fiscal year.  Check all appropriate boxes. | |
|---|---|
| ☐ Less than 80% from Federal contracts/subcontracts | ☒ 80% or more from Federal contracts/subcontracts |
| ☒ Less than $25,000,000 from Federal contracts/subcontracts | ☐ $25,000,000 or more from Federal contracts/subcontracts |

| SEVEN HILLS CONSTRUCTION, LLC. | CAROTHERS CONSTRUCTION, INC. |
|---|---|
| BY: | BY: |
| TITLE: Chief Operating Officer | TITLE: David B. Smith, Purchasing |
| DATE: 09/20/2014 | DATE: 09/23/2014 |

**CAROTHERS CONSTRUCTION, INC.**
**P.O. BOX 189, TAYLOR, MS 38655**
**PHONE: 662-513-8820**
**FAX: 662-234-3292**

## FEDERAL SUBAWARD REPORTING SYSTEM

## SUBCONTRACTOR PROVIDED INFORMATION

### *Attention*

All information MUST be filled out except for noted (**)

If

80% (percent) or more of the Subcontractor's annual gross revenues are from Federal contracts (&
subcontracts), loans, grants (and sub grants) and cooperative agreements

&

$25,000,000 or more in annual gross revenues are from Federal contracts
(& subcontracts), loans, grants (and sub grants) and cooperative agreements.
Then noted (**) must be filled out.

| | |
|---|---|
| PROJECT NAME: | Bridgeport Army Reserve Center, Branford, CT<br>Contract No. W912QR-14-C-0024, RFP No. W912QR-14-R-0021 |
| SUBCONTRACTOR NAME: | Seven Hills Construction, LLC. |
| SUBCONTRACT AWARD AMOUNT: | $307,782.00 |
| SUBCONTRACT AWARD DATE: | September 23, 2014 |
| SUBCONTRACTOR'S WORK: | Roofing System |
| SUBCONTRACT NUMBER: | 512-038820 |
| SUBCONTRACTOR'S PHYSICAL ADDRESS/ NINE-DIGIT ZIP CODE: | 241 Annandale Ave. Salisbury, NC 28144-2703 |
| SUBCONTRACTOR'S CONGRESSIONAL DISTRICT: | NC-12 |
| SUBCONTRACTOR'S PRIMARY PERFORMANCE LOCATION ADDRESS/ NINE-DIGIT ZIP CODE: | 241 Annandale Ave Salisbury, NC 28144-2710 |
| SUBCONTRACTOR'S PRIMARY PERFORMANCE LOCATION CONGRESSIONAL DISTRICT | NC-12 |
| SUBCONTRACTOR'S DUNS NUMBER | 780427535 |
| SUBCONTRACTOR'S PARENT COMPANY DUNS NUMBER (IF APPLICABLE) | N/A |
| SUBCONTRACTOR'S NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM CODE (NAICS) | 236230, 238160 |
| **NAMES AND TOTAL COMPENSATION OF EACH OF THE SUBCONTRACTOR'S FIVE MOST HIGHLY COMPENSATED EXECUTIVES IF APPLICABLE: | |

# EXHIBIT C



**AMERICAN ARBITRATION ASSOCIATION®**

**CONSTRUCTION ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐
There is no additional administrative fee for this service.

| | |
|---|---|
| Name of Respondent: Developers Surety and Indemnity Company | Name of Representative (if known): Bert J. Capone, Esq. |
| Address: **See representative's information.** | Name of Firm (if applicable): Bishop & Reidy, P.C. |
| | Representative's Address: 2300 Crown Colony Drive, Suite 203 |
| City:          State:          Zip Code: | City: Quincy          State: MA          Zip Code: 02169 |
| Phone No.:          Fax No.: | Phone No.: 617-786-7575          Fax No.: 617-689-8880 |
| Email Address: | Email Address: bcapone@brlegalpc.com |

The named claimant, a party to an arbitration agreement dated  see attachments  , which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

**Arbitration Clause:** Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.

**Contract Form:** Please see the customized subcontracts and bonds attached to Exhibit "A" to this Demand for Arbitration.

The Nature of the Dispute:

## Please see Exhibit "A" to this Demand for Arbitration.

| | |
|---|---|
| Dollar Amount of Claim: $  In excess of $4,000,000.00 | **Other Relief Sought:** ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Punitive/ Exemplary  ☐ Other |
| Amount Enclosed: $  7,000.00 | In Accordance with Fee Schedule: ☐ Flexible Fee Schedule  ☑ Standard Fee Schedule |

Please describe appropriate qualifications for arbitrator(s) to be appointed to hear this dispute:

## The arbitrators should be familiar with construction projects for the United States Army Corps of Engineers.

| | |
|---|---|
| Hearing Locale Requested: Jackson, Mississippi | Project Site:  Please see Exhibit "A". |
| Estimated Time Needed for Hearings Overall:          hours or 8          days | Specify Type of Business:  Claimant  Prime Contractor  Respondent  Surety |

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| | |
|---|---|
| Signature (may be signed by a representative) *Ralph B. Germany Jr.*          Date: April 17, 2017 | |
| Name of Claimant: Carothers Construction, Inc. | Name of Representative: Ralph B. Germany, Jr. |
| Address (to be used in connection with this case): **See representative's information.** | Name of Firm (if applicable): Bradley Arant Boult Cummings LLP |
| | Representative's Address: P. O. Box 1789 |
| City:          State:          Zip Code: | City: Jackson          State: MS          Zip Code: 39215 |
| Phone No.:          Fax No.: | Phone No.: 601-592-9963          Fax No.:  601-592-1463 |
| Email Address: | Email Address: rgermany@bradley.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*

**AMERICAN ARBITRATION ASSOCIATION**

CAROTHERS CONSTRUCTION, INC.

v.

DEVELOPERS SURETY AND INDEMNITY COMPANY

## EXHIBIT "A" TO DEMAND FOR ARBITRATION

Carothers Construction, Inc. ("Carothers") files this Demand for Arbitration against Developers Surety and Indemnity Company ("Developers"). Carothers would show as follows:

1.      Carothers is a Mississippi corporation qualified to do business in Georgia, South Carolina, Connecticut, and Kansas.

2.      Developers is an Iowa corporation doing business in Georgia, South Carolina, Connecticut, and Kansas.

3.      This arbitration relates to a series of egregious, bad faith actions taken by Developers in connection with performance and payment bonds Developers issued to protect Carothers on construction projects in Georgia, South Carolina, Connecticut, and Kansas. Developers has failed and refused to pay Carothers millions of dollars unquestionably owed to Carothers. The evidence shows that Developers' intent is to try to cash-starve Carothers so that Carothers will settle for pennies on the dollar on claims that cannot in good faith be disputed. Without limitation, this evidence includes the fact that Developers ignored undisputed facts and controlling law. Further, Developers has denied all liability to Carothers, while at the same time in a separate lawsuit against its own subcontractor principal Developers has been taking the position against its principal that Carothers' claims are well-founded. In fact, Developers has taken that position in sworn statements confirming that Developers has reached that conclusion

**Page 1 of 16**

after its own experts' reviews of Carothers' claim documentation. Regardless of whether this evidence proves an intent to try to cash-starve Carothers into submission, the totality of the evidence shows the duplicitous, bad faith handling by Developers of Carothers' claims.

4.      Carothers begins with the claims arising out of the White Elementary School project at Fort Benning, Georgia (the "White Elementary Project"). On the White Elementary Project, Carothers subcontracted with Liberty Enterprises Specialty Contractor, LLC ("Liberty"). Carothers attaches a copy of the "White Elementary Subcontract" as Exhibit "1".

5.      Developers provided Carothers a performance bond (the "White Performance Bond") and a payment bond (the "White Payment Bond") for the White Elementary Project. Copies of those bonds are attached as Exhibits "2" and "3". As shown on their faces, those two bonds incorporated the White Elementary Subcontract.

6.      The White Elementary Subcontract provides for binding arbitration in Jackson, Mississippi. Please see Section 19 of Exhibit "1". The White Performance Bond's and the White Payment Bond's incorporation of the White Elementary Subcontract incorporated that arbitration provision. Therefore, Developers is obligated to arbitrate with Carothers in Jackson, Mississippi.

7.      The White Performance Bond contains terms that are different from more commonly-seen performance bond forms. Developers is bound to the actual terms of the bonds it executed.

8.      Section 1 of the White Performance Bond provides as follows insofar as defining when Developers was obligated to *act to cure* under that Section:

SURETY'S CURE OF PRINCIPAL'S FAILURE TO PERFORM. Whenever the Principal has failed to perform any part of the Subcontract Work fully, in the manner, and within the time required, or whenever the Principal has failed to perform any of its obligations under the Subcontract, upon notice from Obligee, Surety at its own expense and promptly under the circumstances, but in no event more than 30 days after Obligee's notice,

4/508026.1

shall do one of the following:…. [with remainder of the section then setting out required *actions*].

9.      By its plain terms, Section 1 triggers Developers' responsibility *to cure* when two things have occurred: (1) Liberty has failed to perform any of its obligations under the Subcontract; and (2) Carothers has given Developers notice. Section 1 does not require a default. A mere failure to perform is sufficient. Section 1 does not require a declaration of default. Section 1 does not require a default termination. Other bond forms might require a default, a declaration of default, and/or a default termination, but Section 1 contains no such requirements. Carothers mentions these critical distinctions because Developers has apparently ignored them. It is black letter law that our Performance Bond is to be enforced as written – i.e., by its actual terms as opposed to what might be appropriate under other industry-standard bond forms.

10.      Section 1 requires prompt action, and "in no event more than 30 days after" Carothers' notice. Without limitation, this means Developers' failure to act within 30 days constitutes a default of Developers' obligation to "promptly" act. Once (1) Liberty failed to perform and (2) Carothers put Developers on notice of Liberty's failure to perform, then Developers had to act under one of the options allowed in the remainder of Section 1 and do so in no more than 30 days. Section 1 went on to obligate Developers to compensate Carothers for all of Carothers' damages incurred as a result of Seven Hills' failure to perform. To be clear, no later than 30 days after Carothers first put Developers on notice of Liberty's performance failures, Developers was in default of its obligations under Section 1 if Developers did not affirmatively take one of the actions required under Section 1. Developers has never met its obligations under Section 1. More on this below.

11.      Section 2 of the White Performance Bond contains the following additional commitment by Developers:

**Page 3 of 16**

> To the fullest extent allowed by law, Principal [Liberty] and Surety [Developers], jointly and severally, shall defend, hold harmless, and indemnify the Obligee [Carothers] of and from all loss, liability, damage, or expense, including attorneys' fees, arising from or related to any failure by the Principal to perform the Subcontract Work and all of its obligations under the Subcontract fully, timely, properly, safely, and in strict compliance with the Subcontract.

These terms independently obligated Developers to indemnify, hold harmless, and defend Carothers as to all claims and losses at issue herein. Developers held these obligations under Section 2 over and above its obligations under Section 1. Section 2 independently entitles Carothers to relief from Developers as described herein. Further, the law instructs that these kind of broad-form indemnity obligations are not capped by any penal sum.[1]

    12.    Liberty defaulted on the White Elementary Project. Liberty failed to provide the resources necessary to timely and properly perform its work, failed to timely perform its work, failed to properly perform its work, failed to live up to its own schedule commitments, failed to provide and maintain the necessary financing to fund its work, failed to timely and properly pay its bills, and committed other breaches and defaults.

    13.    Carothers put Developers on notice of Liberty's payment defaults no later than November 21, 2016. No later than December 14, 2016, Carothers put Developers on notice of a broader range of Liberty's defaults, including as described in the preceding paragraph.

    14.    Again, as noted above, per the White Performance Bond, Developers owed Carothers a response under Section 1 within no more than 30 days of notice of Liberty's failures to performance.

    15.    By mid-December 2016 Developers' representatives were communicating with Carothers regarding the Liberty defaults. Those communications included instructions that

---

[1] Each of the four Performance Bonds at issue herein contained the same terms.

**Page 4 of 16**

Carothers should begin looking for replacement subcontractors. Carothers complied,

immediately beginning the process of trying to find replacement subcontractors.

16.     Developers was at the same time communicating with Liberty and hearing

Liberty's story. During this time, Developers never communicated to Carothers that Developers

was even beginning to agree with Liberty's story, which included certain claims by Liberty that

Liberty was not behind with its work nor otherwise in breach or default. Rather, Developers

indicated to Carothers that Developers agreed Liberty was behind, and Developers instructed

Carothers to proceed with efforts to find replacement subcontractors. Further, at this time

Developers denied Liberty's request to modify its schedule of values (to shift more funds to

work already performed and soon to be performed), and, Developers denied Liberty's request for

financing. Also, it must be noted that Liberty had sub-subcontracted all of the labor for its scope

under the White Elementary Subcontract to an entity called S&S Drywall, and, that Liberty had

done so on essentially an hourly-rate basis with no cap or other limit on the sums to be paid to

S&S. Developers learned about this usual, risk-laden arrangement no later than during this same

December 2016 timeframe.

17.     Carothers, as it said it would do in response to Developers' instructions, sought

proposals from potential completion subcontractors for Liberty's scope on the White Elementary

Project. However, due to lack of interest from those in the market, Carothers was able to obtain

only two such proposals. And neither of those two proposals even covered all of Liberty's scope.

Over and above the scope coverage issue, there were a host of other problems with these two

proposals, including but not limited to the following: (a) the prices quoted would result in total

costs in excess of the stated penal sum of the White Performance Bond; (b) neither of the two

potential subcontractors submitting proposals would commit to meet the project schedule, nor to

**Page 5 of 16**

liability for failure to meet the project schedule; and (c) neither of these two potential subcontractors could or would provide bonds.[2] Carothers immediately turned both of these proposals over to Developers. Developers knew these serious deficiencies with the proposals. Developers instructed Carothers to continue to try to find other prices, and Carothers tried to do so, although without success.

18.    At the same general time all of the above was happening, Liberty provided a cure plan in response to Carothers' demands that Liberty cure its defaults, and, Liberty, Developers, and Carothers met at the project site. At that meeting both Carothers and Developers warned Liberty that if Liberty failed to meet it promises under its cure plan, that Carothers would likely default terminate Liberty.

19.    Following that meeting, Liberty failed to cure its defaults. Liberty's defaults included a failure to meet its own cure plan.

20.    Next, Liberty set in motion a plan to abandon the White Elementary Project, and did so without any notice to Carothers. Carothers learned about the planned abandonment indirectly from a representative for S&S Drywall who had talked with Liberty's superintendent. Carothers immediately e-mailed Liberty and Developers regarding this apparent plan to abandon. Liberty never responded to Carothers, but the abandonment was confirmed by Liberty actually abandoning the White Elementary Project. Liberty also simultaneously abandoned the Beaufort project it had with Carothers, another job that Developers bonded. Please see the subcontract,

---

[2] The White Elementary Performance Bond required replacement bonds from any completion subcontractor tendered by Developers.

performance bond, and payment bond for the Beaufort project which attached as Exhibits "4", "5" and "6".[3]

21.     On January 3, 2017, Carothers terminated Liberty for default on the White Elementary Project. Carothers made this default termination based on all of Liberty's defaults, but Carothers notes in particular that Carothers' default termination grounds included Liberty's abandonment of the White Elementary Project.

22.     When Carothers terminated Liberty for default on the White Elementary Project, Developers had not taken the position that Liberty had any excuses for its defaults, nor that Liberty had any rights to abandon the project. Instead, all indications from Developers were that Developers recognized that action had to be taken due to Liberty's defaults, including Liberty's abandonment.

23.     Hornbook law instructs that abandonment is the unforgiveable sin on a construction project. Abandonment results in loss of defenses and claims that otherwise might exist. This is particularly true when the subcontract contains a duty to proceed clause and dispute resolution provisions, both of which are true under the subcontracts in the question here. Please see, without limitation, Section 19 of the White Elementary Subcontract, which not only provided for dispute resolution through arbitration, but also included the following duty to proceed terms:

> No claim, dispute, or matter in controversy or question shall interfere with the progress of construction, and the Subcontractor shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim, dispute, or matter in controversy or question.

---

[3] This subcontract and these bonds contain the same provisions regarding arbitration, duty to proceed, duty to respond, and indemnity as did the corresponding documents for the White Elementary project.

4/508026.1

24.     Following the default termination and abandonment on the White Elementary Project, Carothers promptly advised Developers that mitigation of damages required that Carothers on an interim basis put supplemental forces in place performing Liberty's scope. Developers did not object, and even to date has not objected, to Carothers' completion actions.

25.     As noted above, Carothers had obtained two subcontractor proposals for completion of Liberty's scope on the White Elementary Project. Following the abandonment and default termination, Developers itself reached-out to dozens of other potential replacement subcontractors. Most would not even return Liberty's calls. None were willing to take on the full scope. Upon information and belief, Developers never even got quotes from any of these other potential replacement contractors.

26.     Developers' unsuccessful effort to get better completion prices went on for weeks. Ultimately, Developers' actions proved there was no potential replacement subcontractor with better pricing.

27.     It was at that point that Developers changed course. Developers then denied Carothers' claim on the White Elementary Project in total. Developers started claiming that Carothers' default termination was wrongful.

28.     There are a host of egregious problems with Developers' denial. First, Developers did not even bother to respond until February 9, 2017. That response was too late per Developers' obligations under the White Elementary Performance Bond, which required action within no more than 30 days. That late response in and of itself constituted a breach and default as to which Carothers is entitled to relief, including but not limited to insofar as preclusion of rights that Developers might otherwise have.

4/508026.1

29.     Developers provided its full response explaining its denial on February 14, 2017.[4]

In that response, Developers starting pushing a series of arguments Developers says it obtained

from Liberty and from Developers' own review of documentation provided to Developers by

Carothers. In a nutshell, Developers contended that Liberty had been impacted by prior delays

and this therefore made Carothers' default termination not only wrongful, but a bad faith

termination. The facts do not begin to support such contentions. As noted above, during

December 2016 and January 2017, Developers was meeting and communicating with Liberty,

and hearing Liberty's story. All the while, Developers was instructing Carothers that Carothers

should proceed with getting replacement subcontractors. During the critical time, Developers not

once came to Carothers and claimed that Carothers needed to grant Developers additional relief.

Instead, Developers was joining in Carothers' warnings that if Liberty failed to meet its own cure

plan, then Carothers would likely default terminate Liberty. Further, Developers during this

critical time refused to provide Liberty the financial assistance that Liberty requested, with

Liberty telling Developers that Liberty had to have that assistance in order to stay on the job. In

sum, during the critical times, Developers was not buying any of what Liberty was trying to sell.

But, weeks later, after Developers' saw that the total damages would be staggering, Developers

reversed course and took the position that Liberty should have been granted relief and that the

default termination was wrongful.

30.     Carothers will at the hearing further demonstrate why Developers' denial of

liability was totally groundless. For now, Carothers points out two key components. First, as a

matter of law, Liberty's abandonment trumps any excuses Liberty and Developers might have

otherwise had. This is true not only under nationally-prevailing construction law, but also under

---

[4] The February 9, 2017 response was a brief response. Developers advised it could not provide a more
detailed response on that date to a severe weather event.

**Page 9 of 16**

Georgia law. Carothers sent that legal authority to Developers and demanded that Developers reverse its position. Developers failed to meaningfully respond.

31.     Second, as a key contention supposedly supporting its position, Developers contends that in October 2016 Carothers acted inappropriately toward Liberty, making improper demands and failing to grant Liberty appropriate relief. Developers contends that the events in October 2016 were the key turning point. Developers based that contention on what it says it heard from Liberty about Carothers supposedly pushing Liberty too hard at that time, with a resulting significant financial impact on Liberty.

32.     Here is what really happened in October 2016. It was at that time that Liberty told Carothers that Liberty was in serious financial trouble because of a bad job Liberty had with another prime contractor. Because of its financial problems, Liberty asked for Carothers' help. And Carothers helped. Carothers changed the payment schedule for the benefit of Liberty. Instead of paying Liberty following receipt of payment from the owner, Carothers began paying Liberty every two weeks for work performed in those weeks. Developers either failed to get these facts from Liberty, or ignored them after getting from Liberty.

33.     In any event, immediately after Developers' denial of Carothers' claim, Carothers demanded a conference call with Developers. During that conference call Carothers shared with Developers the facts about what happened in October 2016. Developers, after learning these facts, has persisted with its wrongful denial. It must also be noted that Developers bonded Liberty not only on the White Elementary and Beaufort jobs (*both* of which Liberty abandoned) but also on other jobs. Carothers has been advised that Liberty abandoned approximately nine jobs. During the referenced conference call with Developers, Carothers asked (and then

**Page 10 of 16**

demanded) that Developers say how many jobs Liberty had abandoned. Developers refused to answer. Developers knows how many jobs its financially-troubled principal abandoned.

34.     Carothers has continued with its efforts to complete Liberty's work on the White Elementary Project. Carothers anticipates that its total costs, losses, and damages incurred completing Liberty's work and as a result of Liberty's defaults will be no less than the principal amount of $3,400,000. Carothers' damages will include both costs in completing Liberty's scope and impact costs incurred with other trades. The unpaid balance on the White Elementary Subcontract is $1,156,903.60. Carothers principal damages alone will exceed that balance by no less than $2,240,000. Carothers seeks recovery of all damages it incurred and incurs on the White Elementary Project.

35.     Carothers is having to fund the completion costs for Liberty's scope for the White Elementary Project, plus the acceleration costs and other impact costs for other trades. For those and other reasons Carothers is entitled to both pre-award and post-award interest at the highest rates allowed by law. Carothers is also entitled to recovery of its attorneys' fees, costs, and expenses.

36.     Developers' outrageous denial of liability constituted bad faith conduct. Neither the facts nor the law begin to support Developers' denial. Further, Developers, since its denial, has been provided key facts and law which directly refute the supposed grounds for its complete denial of liability, yet Developers persists with its denial. Developers' bad faith actions entitle Carothers to punitive damages.

37.     Obviously Developers' approach is driven at least in part by the magnitude of its damages liability. The damages numbers are not subject to any serious debate, as they are driven by actual costs to complete, which have been vouched-in by the two completion proposals

**Page 11 of 16**

referenced above. To be clear, the record shows those two proposals were the only ones that could be obtained, meaning there was no cheaper completion pricing to be obtained. Further, Carothers, as a cost-savings effort, elected to engage and manage S&S Drywall on a time-and-material basis to complete the drywall portion of Liberty's scope, with solid management and oversight by Carothers. Carothers' efforts will result in mitigation of the damages for which Developers is responsible, because Carothers' efforts will result in the costs-to-complete being less than what they would have been if either of the two above-referenced proposals had been used. Developers cannot deny any of this. Again, Developers, without success, tried to get alternative completion proposals.

38.     Developers has also refused to resolve one or more claims under the White Performance Bond. As a result, Carothers' own payment bond has and/or may be made the subject of one or more payment bond claims. Tellingly, Developers has taken the position with S&S Drywall (the company providing all the labor for Liberty) that its payment bond claim for the time S&S Drywall worked for Liberty must be denied in light of the abandonment. To be clear, while telling Carothers that the abandonment was totally justified (and justified so unequivocally so as to merit a complete and total denial of liability under the White Performance Bond), Developers is at the same time telling S&S Drywall that its payment bond claim must be denied in light of S&S's supposed abandonment. Carothers is entitled to be held harmless, defended, and indemnified for all losses in relation to payment bond claims, and requests relief accordingly.

39.     As referenced above, Liberty also abandoned the Beaufort project. Carothers is entitled to all of its damages, costs, losses, and expenses under the performance and/or payment bonds for that project. The exact amount will be shown at the hearing, but they will be at least

$130,000.00.[5] As shown above, the Beaufort subcontract provided for arbitration in Jackson, Mississippi, and the bonds incorporated the subcontract, and, therefore, incorporated the subcontract's arbitration provisions. Carothers seeks all of its principal damages for Liberty's default on the Beaufort project, plus pre-award interest, post-award interest, attorneys' fees, costs, and expenses.

40.     Developers has taken the same outrageous approach on two other projects it bonded for the benefit of Carothers. One of those projects was the Bridgeport Army Reserve Center project in Branford, Connecticut (the "Bridgeport Project"). Please see the subcontract and bonds attached as Exhibits "7", "8" and "9" for the Bridgeport Project. That subcontract likewise provided for arbitration, and, the bonds likewise incorporated the subcontract. The subcontract provided for arbitration at a mutually-agreeable location. As shown above, Developers has already agreed to Jackson, Mississippi as a proper location for arbitration between Carothers and Developers. Further, the claims involved with the Bridgeport Project likewise involved egregious, bad faith conduct by Developers, of the same nature and with the same intent. Please also see Section 19 of that Bridgeport subcontract which specifically allowed for joinder for claims that involve shared issues.[6]

41.     On the Bridgeport Project, Developers' subcontractor principal, Seven Hills Construction, LLC ("Seven Hills"), likewise ultimately abandoned the project. Carothers first put Developers on notice of Seven Hill's breaches and defaults on the Bridgeport Project in December of 2015, and then again in January of 2016. Carothers' notices specifically referenced that delay-related damages were a significant looming issue. Developers did not timely respond

---

[5] This damages amount does not include any liquidated damages assessment; Carothers hopes to be able to avoid liquidated damages.

[6] The same is true with the Ft. Leavenworth project subcontract and bonds described below.

**Page 13 of 16**

4/508026.1

or act. Developers never properly responded or acted. Ultimately, Carothers had to hire another subcontractor to complete Seven Hills' work after Seven Hills abandoned the Bridgeport Project. Carothers is owed compensatory damages of not less than $1,350,000.00 (which includes not only Carothers' own direct damages but also liquidated damages assessed by the owner because of the incomplete roof work) on the Bridgeport Project, plus pre-award interest, post-award interest, attorneys' fees, costs, and expenses.

42.     Further, on this Bridgeport Project, Developers has once again wrongfully denied a payment bond claim. Developers' principal, Seven Hills, executed an agreement with the United States Department of Labor ("DOL") confirming that Seven Hills had failed to make the required payments to its laborers. Seven Hills then failed to make the curative payments under that DOL agreement. When Seven Hills failed to make those payments, the DOL demanded that Carothers pay them. Due to the law, Carothers had no choice but to pay them. Before it paid them, Carothers demanded that Developers pay them, as it was obligated to do under *both* of the bonds it provided for the Bridgeport Project, but Developers refused to pay. Carothers is entitled to be held harmless, defended, and indemnified for all payment bond claims, including not only what Carothers had to pay the DOL, but also for pre-award interest, post-award interest, attorneys' fees, costs, and expenses.

43.     On the Bridgeport Project, Carothers has provided Developers with the facts and the legal authorities demonstrating Carothers' entitlement to full compensation for its claims. Developers has failed and refused to pay Carothers on these claims. Developers' denials have been made in bad faith. As just one example of Developers' bad faith conduct, Developers has with Carothers taken the position that Carothers needs to provide further back-up for Carothers' claims, and, at the same time denied all liability under the claim. Yet while taking that position

4/508026.1

with Carothers, Developers has submitted affidavits in Developers' separate lawsuits against Seven Hills in which Developers swore that, "[b]ased upon a review and analysis performed by Cashin Spinelli [Developers' experts], Developers *expects to sustain*" a performance bond loss on the Bridgeport Project of "$384,728.00" (emphasis added). This is not a mere statement about a claim having been filed and the surety requesting that it be placed with funds to cover the claim. This a sworn statement by Developers that, based on the review and analysis already performed by Developers' own experts, Developers expects to sustain at least a penal sum loss to Carothers. Meanwhile, Developers is denying all liability to Carothers, and, just as incredibly, claiming it needs more proof, despite the facts its experts have, based on what they have already reviewed, already concluded Developers will have to pay Carothers at least a $384,728.00 loss on the Bridgeport Project.

44.     As referenced above, Carothers has claims against Developers on a fourth project, the Ft. Leavenworth Project. Please see the subcontracts and bonds attached as Exhibits "10", "11" and "12".[7] Developers itself procured the default termination of Seven Hills on the Ft. Leavenworth. Developers paid only part of the damages suffered by Carothers on the Ft. Leavenworth Project, denying liability for the rest, including delay-related damages. Nevertheless, Developers has once again shown its true colors with how it has proceeded against Seven Hills. The same affidavit referenced above makes the same kinds of statements that, based on Developers' experts' review and analysis, Developers has already determined that it will sustain an additional $380,342.00 performance bond loss on the Ft. Leavenworth Project. Once again, this is despite denying liability to Carothers.

---

[7] This subcontract and these bonds contain terms corresponding with those for the Bridgeport project, and, for the reasons stated above as to the Bridgeport, the claims on the Ft. Leavenworth project should be heard in this arbitration.

4/508026.1

45.     To be clear, while denying all further liability to Carothers on the Bridgeport Project and the Ft. Leavenworth Project, Developers has issued sworn statements confirming that Carothers is owed at least $765,070.00 on those two projects.

46.     Carothers seeks all of its damages. The principal amount of its damages total not less than $4,000,000.00.

47.     Carothers seeks punitive damages.

48.     Carothers seeks pre-award and post-award interest.

49.     Carothers seeks its attorneys' fees, costs, and expenses.

50.     Carothers seeks its fees, costs, and expenses in this arbitration.

51.     Carothers seeks any and all such further relief as to which it may be entitled.

52.     Carothers reserves the right amend.

Respectfully submitted on April 17, 2017.

CAROTHERS CONSTRUCTION, INC.

By: _____
        Ralph B. Germany, Jr.

4/508026.1

STATE OF CONNECTICUT:
                   : SS. WEST HARTFORD       May 1, 2017
COUNTY OF HARTFORD  :

                 THEN and by virtue hereof and by direction of the plaintiff's

Attorney, I made due and legal service of the within original Writ, Summons

and Complaint by leaving a true and attested copy with and in the hands of

Gary Scappini, Manager for NATIONAL REGISTERED AGENTS, whom is the duly

authorized Statutory Agent to accept service on behalf of the within named

defendant:

**CAROTHERS CONSTRUCTION, INC.**

At One Corporate Center, 14th floor, Hartford, CT.

                 THE WITHIN IS THE ORIGINAL WRIT, SUMMONS AND
COMPLAINT WITH MY DOINGS HEREON ENDORSED.

FEES:                                 ATTEST:

| | |
|---|---|
| SERVICE | $ 40.00 |
| TRAVEL | $ 14.80 |
| ENDORSEMENTS | $  1.20 |
| PAGES | $ 52.00 |

SCOTT M. KRAIMER
STATE MARSHAL
HARTFORD COUNTY

TOTAL         $108.00

**SCOTT M. KRAIMER**
CONNECTICUT STATE MARSHAL
P.O. Box 271621 • West Hartford, CT 06127-1621 • 860-521-1223