UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEVELOPERS SURETY AND INDEMNITY CO.,

*Plaintiff*,

*v.*

CAROTHERS CONSTRUCTION, INC.,

*Defendant.*

Civil No. 3:17-cv-875 (JBA)

March 19, 2018

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

In this insurance coverage dispute, Plaintiff Developers Surety and Indemnity Company ("DSI"), a surety, seeks a declaratory judgment and injunctive relief providing that DSI is not bound by the arbitration provision in the subcontract between DSI's principal, subcontractor Seven Hills Construction, LLC ("Seven Hills"), and Defendant general contractor Carothers Construction, Inc. ("Carothers"), to arbitrate disputes with Carothers that have arisen under the Project Performance and Payment Bonds issued by DSI. Plaintiff moves [Doc. # 27] for summary judgment, and also seeks, in the alternative, a judgment that *if* DSI is bound by the arbitration provision, that such arbitration should take place in Connecticut, under Connecticut law. Defendant cross-moves [Doc. # 32] for summary judgment and seeks a stay of this action and transfer to the United States District Court for the Southern District of Mississippi, so that an order compelling arbitration can be entered by that court. If Plaintiff prevails and the Court issues a declaratory judgment that DSI is not bound by the arbitration provision, Defendant has moved in the alternative to transfer venue to the United States District Court for the Middle District of

Georgia. For the reasons set forth below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, and DENIES Defendant's requested transfer to the Middle District of Georgia.

## I.     Background

Plaintiff DSI originally filed this action, arising out of a construction project in Branford, Connecticut, known as the Roofing System for the Bridgeport Army Reserve Center, in the Connecticut Superior Court, Judicial District of New Haven on May 5, 2017.[1] (Ex. A (Compl.) to Not. Removal [Doc. # 1-1] ¶ 3.) On May 25, 2017, Defendant Carothers removed the action to federal court on the grounds of diversity jurisdiction. (Not. Removal [Doc. # 1] at 1.)

Plaintiff DSI is a California corporation with offices in Irvine, CA, while Defendant Carothers is a Mississippi corporation with offices in Taylor, Mississippi. (Joint Stmt. Undisputed Facts and Documents (hereinafter "Joint Stmt.") [Doc. # 28] at 1.) Carothers' subcontractor, Seven Hills Construction, LLC, is a limited liability company with offices in Virginia and North Carolina. (*Id.*) This case involves "commerce" within the meaning of the Federal Arbitration Act. (*Id.*) On or about February 3, 2015, DSI, as surety, issued a Subcontract Performance Bond and a Subcontract Payment Bond, Bonds No. 505470P for the Project on behalf of its principal, Seven Hills, which was a subcontractor to Carothers, the Obligee under the Project Bonds and the general contractor on the Project. (*Id.* at 2.)

The Project Bonds are comprised of the Subcontract Performance Bond, the Subcontract Payment Bond, and the Surety Bond Rider, and were issued in conjunction with the Subcontract

---

[1] Although the Complaint was dated April 27, 2017, the Superior Court docket reflects that the Complaint was returned on May 5, 2017.

for the roofing system for the Project between Seven Hills and Carothers. (*Id.*) The Subcontract was executed in September 2014. (*Id.*)

During the course of performance on the Project, disputes arose between Seven Hills and Carothers that resulted in Carothers declaring Seven Hills in default and in Carothers making claims against DSI. (*Id.*) DSI has denied Carothers' claims. (*Id.*) In April 2017, Carothers filed a Demand for Arbitration with the American Arbitration Association naming DSI as the sole Respondent. (*Id.*) In the Demand, Carothers sought to arbitrate its disputes with DSI as to the Project and three other projects. (*Id.* at 3.)

This case involves the interpretation of a contractual provision that three different federal district courts outside of the Second Circuit have separately construed in the last year, reaching divided conclusions. *Compare DSI v. Carothers*, No. CV 9:17-1419-RMG, 2017 WL 3054646, at *4 (D.S.C. July 18, 2017) (finding DSI bound by the arbitration provision) *with DSI v. Carothers*, No. 17-2292-JWL, 2017 WL 3674975, at *4 (D. Kan. Aug. 24, 2017) (finding DSI was not bound by the same arbitration provision) *and DSI v. Carothers*, No. 1:17-CV-1979-SCJ, at *4-5 (N.D. Ga. Feb. 27, 2018) (finding DSI was not bound by same arbitration provision but was estopped from avoiding arbitration).

The two sets of documents at issue here are the Project Bonds—which are comprised of the Subcontract Performance Bond, the Subcontract Payment Bond, and the Surety Bond Rider—and the Subcontract. The Subcontract Performance Bond, which was executed by both principal Seven Hills and surety DSI (Plaintiff), incorporates the Subcontract executed by Seven Hills and contractor Carothers (Defendant). The Subcontract Performance Bond provides that the "Subcontract is incorporated by reference herein in its entirety and made an integral part of this

Subcontract Performance Bond[.]" (Ex. A (Subcontract Performance Bond) to Joint Stmt. [Doc. #

28-1] at 1.)

The Subcontract Performance Bond contains two other relevant provisions. Paragraph 5,

"Enforcement by Obligee[,]" provides that:

> This Subcontract Performance Bond shall be governed by the laws of the place of
> the Project which shall be interpreted insofar as possible to require Surety to
> perform fully the Subcontract Work and to satisfy completely all of Principal's
> responsibilities under its Subcontract with Obligee for so long as the Obligee may
> be held liable with respect to the Subcontract Work, such that, to the fullest extent
> allowed by law, if any claim arising from or related to the Principal's alleged failure
> to comply strictly with the Subcontract or if any claim with respect to Obligee's
> liability pertaining to the Subcontract Work is asserted against the Obligee, against
> any bond or other security furnished by the Obligee, or against persons or entities
> to whom Obligee may be liable, such claim is also covered by the Subcontract
> Performance Bond, subject only to the penal sum hereof.

(*Id.* at 2.) Paragraph 6, "Right of Action[,]" provides that:

> No right of action shall accrue on this Subcontract Performance Bond to or for the
> use of any person or entity other than the Obligee and Obligee's heirs, executors,
> administrators, assigns, and legal successors. Obligee is entitled to bring an action
> against Surety on this Subcontract Performance Bond, including specific
> performance of Surety's obligations hereunder, without being required to name the
> Principal.

(*Id.*) The Subcontractor Payment Bond, which was executed by both principal Seven Hills and

Plaintiff DSI, similarly incorporates the Subcontract executed by Seven Hills and Defendant

Carothers. (Ex. A (Subcontractor Payment Bond) to Joint Stmt. at 1.) The Subcontractor Payment

Bond also includes an analogous choice-of-law provision, under which the Bond shall be

"governed by the law of the place of the Project[.]" (*Id.* at 2.)

Finally, the Surety Bond Rider, which was also executed by both Seven Hills and Plaintiff

DSI, amends two provisions of the Subcontractor Performance and Payment bonds—neither of

which is relevant here—and also incorporates the Subcontract by reference. (Ex. A (Surety Bond Rider) to Joint Stmt.) In incorporating the Subcontract, however, the Surety Bond Rider makes clear that "in the event and to the extent that any terms and conditions of the incorporated contract documents conflict or are inconsistent with the terms of this Performance and Payment Bond and Rider, the terms of this Performance and Payment Bond and Rider shall take precedent [sic] and shall control." (*Id.*)

The Subcontract contains five paragraphs focused on dispute resolution, located in Section 19 of the agreement. (Ex. B (Subcontract) to Joint Stmt. at 5-6.) Section 19 is discussed at greater length below, but its first paragraph, reproduced here, delineates the arbitration procedure to be followed in the event of a dispute between "Contractor" and "Subcontractor":

> Except as otherwise specifically provided therein, all claims, disputes, and other matters in controversy **between the Contractor and the Subcontractor** arising out of or relating to this Subcontract shall be decided by binding arbitration in accordance with the current and applicable Construction Industry Rules of the American Arbitration Association, unless the parties both agree to different rules and procedures. The sole exception to **binding arbitration between the Contractor and Subcontractor** is as follows: If the Contractor in good faith believes that any claim, dispute, or matter in controversy with the Subcontractor also involves rights or liabilities of the Owner, Architect, or other third party, then, at the Contractor's sole election, the Subcontractor agrees to resolve such issues in the same forum or proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some or all claims, disputes, and matters in controversy involving the Owner, Architect, or other third party so as to promote economy and avoid inconsistent results.

(*Id.* at 5) (emphasis added.)

## II.     Discussion

*Legal Standard*

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In the context of cross-motions for summary judgment, the same standard applies, and the Court construes the evidence in the light most favorable to the non-moving party for the purpose of deciding each motion. *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001) (citations omitted).

1.  *Enforceability of the Arbitration Provision against Plaintiff*

As a threshold matter, both the Bonds and the Subcontract contain what are in effect Connecticut choice-of-law provisions. The Subcontract Performance Bond provides that it "shall be governed by the laws of the place of the Project[,]" and the Subcontractor Payment Bond "is governed by the law of the place of the Project[.]" (Subcontract Performance Bond ¶ 5; Subcontractor Payment Bond ¶ 3.) The "Project" is a defined term in both bonds, which refers to the "Roofing System under Bridgeport Army Reserve Center Branford, CT Contract No.

W912QR-14-C-0024." (Subcontractor Payment Bond at 1; *see also* Subcontract Performance Bond at 1 (same).) Similarly, the Subcontract provides that "[t]he laws of the State where the Project is located shall govern the interpretation and enforceability of this Subcontract." (Subcontract at 6.) Accordingly, Connecticut law governs the interpretation of the bonds and the subcontract for the purposes of the Court's analysis. In Connecticut, arbitration provisions and surety bonds are both interpreted according to the normal rules of contract construction, and by statute, agreements to arbitrate "must be expressed in a writing." *Green v. Conn. Disposal Serv., Inc.*, 62 Conn. App. 83, 87 (2001) (citations omitted).

"In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

"[A]rbitration is a creature of contract" and a "person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed so to do[.]": "No one can be forced to arbitrate a contract dispute who has not previously agreed to do so." *State v. Phillip Morris, Inc.*, 279 Conn. 785, 796 (2006) (internal quotation marks and citations omitted). "The issue of whether the parties to a contract have agreed to arbitration is controlled by their intention[,]" and their intention "is to be ascertained by a fair and reasonable construction of the written words" used in the contract. *Id.* (internal quotation marks and citations omitted). And so, "[a]s with any question of contract interpretation, we begin with the pertinent language of the agreement." *Id.* at 798.

Similarly, courts "look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,

369 F.3d 34, 51 (2d Cir. 2004). Moreover, "[t]he intent of the parties to a surety bond should be ascertained by a fair and reasonable construction of the written words, and any language used should be given its common and ordinary meaning." *Stonington Water St. Assoc., LLC v. Hodess Bldg. Co.*, 792 F. Supp. 2d 253, 262 (D. Conn. 2011) (citing *Goldberg v. Hartford Fire Ins. Co.*, 269 Conn. 550 (2004)).

The plain language of the Subcontract leads the Court to conclude that the arbitration provision in question does not cover Plaintiff DSI. Section 19 of the Subcontract delineates various different dispute resolution procedures, but specifies arbitration as the mechanism for the resolution of "all claims, disputes, and other matters in controversy *between the Contractor and the Subcontractor* arising out of or relating to this Subcontract . . . unless the parties both agree to different rules and procedures." (Subcontract at 5 (emphasis added).) Section 19 also provides that the "sole exception to binding arbitration *between the Contractor and the Subcontractor* is as follows: If the Contractor in good faith believes that any claim, dispute or matter in controversy with the Subcontractor also involves rights or liabilities of the Owner, Architect, or other third party, then, at the Contractor's sole election, the *Subcontractor* agrees to resolve such issues in the same forum or proceeding[.]" (*Id.*) (emphases added.) Defendant contends that because Plaintiff DSI incorporated the Subcontract in its entirety as surety to the Subcontractor, the term "Subcontractor" in Section 19 should be read to mean "Subcontractor and surety."

Such a reading is implausible in the context of Section 19 of the Subcontract for at least two reasons. First, had the parties intended to bind Plaintiff DSI to this mandatory arbitration provision, the Subcontract could simply have specified arbitration as the dispute resolution mechanism for all claims arising out of or relating to the Subcontract, without a clause limiting the sentence to claims and disputes between the Contractor and Subcontractor specifically, and

without a further clause including the phrase "that parties both agree" that refers back to "the Contractor and the Subcontractor." Similarly, the phrase "binding arbitration *between* the Contractor and Subcontractor" makes clear that the arbitration provision applies not to all disputes arising from the Subcontract but just to claims brought by one of these two parties against the other—as opposed to the instant dispute between DSI and Carothers, which relates to the Subcontract but to which the Subcontractor is not a party.

Second, Section 19 uses the phrase "the Subcontractor and its surety," (*id.* at 6), a mere two paragraphs after the above-referenced language of the arbitration provision, which severely undermines Defendant's argument that the term "Subcontractor" in Section 19 should be read to mean "Subcontractor and its surety." In its briefing and at oral argument, Defendant was unable to explain why the term "Subcontractor" as it first appears in Section 19 should be read to mean "Subcontractor and its surety" when the latter phrase is used elsewhere and to different effect in the same section.

Defendant maintains, nonetheless, that "myopically focus[ing] on two words"— Contractor and Subcontractor—in Section 19's arbitration provision would mean "ignor[ing] the remainder of the Subcontract . . . [and] contorting the meaning the [arbitration provision] until an absurd result is reached." (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. [Doc. # 35] at 7.); (*see also id.* at 9.) But even putting aside the fact that the term "surety" is used in some parts of Section 19 but not the arbitration provision, other parts of the Subcontract make abundantly clear that the term "Subcontractor" cannot be read as interchangeable with "Subcontractor and its surety" universally through the Subcontract.

For example, Section 7 of the Subcontract requires that "the Subcontractor . . . furnish to the Contractor, as obligee, a performance bond and a payment bond with a responsible surety,

acceptable to the Contractor[.]" (Subcontract at 2.) If "Subcontractor" were to be read universally throughout the Subcontract to mean "Subcontractor and its surety," then Plaintiff DSI would be not only responsible for the Subcontractor's substantive obligations under the Subcontract and its own obligations on the bonds, but also responsible for obtaining the bond from itself and furnishing the bond to Defendant—a result that seems unlikely at best.

While many or even most uses of the term "Subcontractor" in the Subcontract could be read to mean "Subcontractor and/or its surety," and while Plaintiff incorporated by reference and agreed to take on those substantive obligations, not every use of the term "Subcontractor" in the Subcontract can be read to encompass Plaintiff DSI as well—including the use of the term in Sections 7 and 19—and so Plaintiff did not agree to be bound by those terms.

Defendant cites a number of cases for the proposition that "the express incorporation-by-reference of another writing is fully effective to import *all* the terms from one agreement into another." (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. at 4.) While undoubtedly correct as a matter of law, this formulation begs the question where the dispute is not whether contract terms were effectively incorporated but rather how to interpret the incorporated terms. None of the Connecticut cases cited by Defendant undermine the Court's conclusion that the arbitration provision here does not cover Plaintiff DSI.

Defendant cites *Vertucci v. Orvis*, No. 3:05-CV-1307 (PCD), 2006 WL 1688078, at *5 (D. Conn. May 30, 2006) as "recognizing incorporation-by-reference as a grounds to compel arbitration against a nonsignatory to the arbitration agreement[.]" (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. at 4.) But that case in fact involved a non-signatory's attempt to compel arbitration

against a *signatory* to the arbitration agreement, and an arbitration agreement that concededly covered and bound the signatory[2]—which is essentially the inverse of the facts here.

Defendant also cites *E&F Constr. Co., Inc. v. Rissill Constr. Assoc., Inc.*, 181 Conn. 317, 317-20 (1980) as "requiring arbitration where [a] second agreement incorporated [a] prior agreement containing [an] arbitration clause[.]" (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. at 4.) But the question in that case was not whether a specific arbitration provision's terms could be read to encompass the plaintiff, but simply whether the arbitration provision had been incorporated by reference. *See E&F Constr. Co.*, 181 Conn. at 320. The actual text of the arbitration provision at issue in that case was not even addressed by the Connecticut Supreme Court. *Id.* at 317-321. Accordingly, the case is inapposite and fails to support Defendant's legal theory.

Finally, Defendant cites *Town of Berlin v. Nobel Ins. Co.*, 60 Conn. App. 56, 61 (2000), as "requiring arbitration of [a] claim involving the surety; the surety did not sign the underlying agreement that called for arbitration, but the surety signed a second agreement that incorporated the underlying agreement[.]" (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. at 4.) This case is similarly inapposite, as it involved the enforcement of an arbitration provision that unlike here, was not limited by its own terms to the resolution of disputes between certain enumerated parties. *See Nobel Ins. Co.*, 60 Conn. App. at 61 (contract provided that "'[a]ny controversy or claim arising out*

---

[2] In that case, the plaintiff retained a law firm, signing a retainer that included an arbitration clause that provided, *inter alia*, that "[y]ou agree that any dispute arising between you and [the law firm] shall be settled . . . by binding arbitration[.]" *Vertucci*, 2006 WL 1688078, at *2-3. The plaintiff brought suit against individual attorneys employed by the firm who had not themselves signed the retainer, and these individual (non-signatory) defendants sought to compel arbitration against the (signatory) plaintiff. *Id.* at 1-3.

*of or related to the contract*, or the breach thereof, shall be settled by arbitration . . . .'" (emphasis added)).[3]

Because Defendant's proposed construction of the Subcontract lacks foundation in the plain language of the arbitration provision and the contract as a whole and lacks legal support, arbitration cannot be compelled based on the text of the Subcontract. In reaching this conclusion, the Court respectfully disagrees with the conclusion reached by one other court that has construed this provision, *see DSI v. Carothers*, 2017 WL 3054646, at *4 (D.S.C. July 18, 2017) (finding DSI bound by the arbitration provision), but concurs with the two other courts that have addressed this question, *see DSI v. Carothers*, 2017 WL 3674975, at *4 (D. Kan. Aug. 24, 2017) (finding DSI was not bound by the same arbitration provision), *DSI v. Carothers*, No. 1:17-CV-1979-SCJ, at *4-5 (N.D. Ga. Feb. 27, 2018) ("The Court finds the interpretation of the Kansas court . . . to be more persuasive.").

---

[3] Defendant also cites a federal district court outside the Second Circuit as having held that the "'First, Second, Fifth, Sixth, and Eleventh Circuits . . . have held that a surety must arbitrate disputes related to a performance bond where the performance bond specifically incorporated by reference a contract containing an arbitration clause.'" (*See* Mem. Supp. Def's Mot. Summ. J. at 3 (quoting *Developers Sur. and Indem. Co. v. Resurrection Baptist Church*, 759 F.Supp.2d 665, 669-670 (D. Md. 2010)).) But the Second Circuit case cited did not involve an arbitration provision that was limited by its own terms to the resolution of disputes between certain enumerated parties, a distinction that the Second Circuit emphasized: "The determination of whether a guarantor is bound by an arbitration clause contained in the original contract necessarily turns on the language chosen by the parties in the guaranty." *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973 (2d Cir. 1975), *abrogated on other grounds by U.K. v. Boeing Co.,* 998 F.2d 68 (2d Cir. 1993). Thus, "where an arbitration clause is applicable by its own terms to all disputes and is not limited to those arising between the Owner and Charterer, the agreement to arbitrate binds 'not only the original parties, but also all those who subsequently consent to be bound by (the terms of the contract).'" *Id.* (citations omitted).

In the alternative, Defendant contends that even if Plaintiff has not actually agreed to mandatory arbitration, Plaintiff should be estopped from seeking to avoid arbitration. Defendant advances two theories of estoppel: first, that Plaintiff has asserted rights and defenses under the Subcontract, and cannot now "deny it is bound by the arbitration provision in that agreement" and second, Plaintiff's "rights, obligations, and legal assertions are intertwined with issues arising under [the Subcontract, which] provides for arbitration." (Mem. Supp. Def's Mot. Summ. J. [Doc. # 32-1] at 8.)

As to the first estoppel theory, Plaintiff contends that it is merely asserting rights and defenses under the terms of the bonds and under surety law generally, and not any rights or defenses specific to the Subcontract, and therefore has not derived any direct benefit from the Subcontract that would make estoppel equitable.

"Non-signatories to an arbitration agreement may . . . be bound according to ordinary principles of contract and agency[,] . . . includ[ing] . . . estoppel." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999) (internal quotation marks and citations omitted). The application of estoppel is "fact specific and differ[s] with the circumstances of each case." *Id.* (internal quotation marks and citations omitted). A "non-signatory may be compelled to arbitrate when it has derived other benefits under the agreement containing the arbitration clause." *Id.* at 98. (citations omitted).

"Where . . . a signatory seeks to compel a nonsignatory, the nonsignatory must have *directly* benefitted from the agreement to trigger estoppel." *Doctor's Assocs. Inc. v. Edison Subs, LLC*, No. 3:13-CV-839 JCH, 2014 WL 29128, at *2 (D. Conn. Jan. 3, 2014) (citation omitted) (emphasis added). And this "doctrine of direct benefit estoppel is a narrow one." *Id.* at 3 (citation omitted).

Defendant presents the Court with little record evidence of Plaintiff having received any direct benefit from the agreement. Notably, Plaintiff's requested relief in the Complaint is limited by its own terms to declaratory and injunctive relief relating to DSI's rights "under the Performance and Payment Bond[,]" with no mention of Plaintiff's rights under the Subcontract. (Compl. at 7.)

Attached to Defendant's Motion for Summary Judgment is the Declaration of Ray Boggs, a Senior Project Manager for Defendant. (Ex. 3 (Boggs Dec.) to Def's Mot. Summ. J. [Doc. # 32-5] ¶ 2.) Citing to September 27, 2016 and December 9, 2016 letters from Plaintiff's counsel to Defense counsel, Bogg contends that "[i]n responding to [Defendant's] claims, [Plaintiff] has asserted that it has alleged rights arising out of the Subcontract[,]" and that "[p]ast actions and experience show that [Plaintiff] will continue to assert alleged rights arising out of the Subcontract." (*Id.* ¶ 14.)

While the Court has no reason to doubt Bogg's surmise—which Defense counsel echoed at oral argument—that Plaintiff will in the future assert alleged rights arising out of the Subcontract, the record does not reflect that Plaintiff has thus far done so in any way substantial enough to qualify as Plaintiff deriving a direct benefit from the Subcontract. Bogg's prediction, therefore, is speculative and not supported by other record evidence.

In the first letter cited by Boggs and included in the record, Plaintiff's counsel requests that Defendant "produce . . . documents demonstrating that [Defendant] paid or otherwise incurred . . . the claimed amounts." (Ex. E (September 27, 2016 Letter) to Joint Stmt. [Doc. # 28-1] at 1.) "Towards this end," Plaintiff's counsel requests "a full and final accounting of" the prime contract, the Subcontract, and the six other subcontracts that were allegedly affected by Seven Hills' default. (*Id.*) While it is true that Plaintiff's counsel requests an accounting of the Subcontract, Plaintiff's counsel does so in the context of requesting an accounting of *seven* other contracts and

subcontracts in order to determine Plaintiff's obligations under the bonds and so does not seem to be exploiting the Subcontract in order to receive any direct benefit thereunder.

In the second letter, Plaintiff's counsel informs Defendant that even though Defendant has not made a claim against Plaintiff "for back wage Davis-Bacon Act Compliance[,]" Plaintiff "re-examine[d] the payment and performance bonds as well as the SHC Subcontract to determine whether" any of those contracts could be read to make Plaintiff responsible for "Davis Bacon Act issues." (Ex. E (December 9, 2016 Letter) to Joint Stmt. [Doc. # 28-1] at 1.) Plaintiff's counsel asserts that with respect to the payment bond, the United States Department of Labor "in no manner qualifies as a defined Claimant" and that with respect to the performance bond, the Subcontract provides that the Subcontractor "'has exclusive liability'" for such issues. (*Id.* at 1-2.) Plaintiff's counsel notes that Plaintiff's "response is a professional courtesy and in no manner shall be construed as a waiver or rights and defenses of [Plaintiff] as all such rights and defenses are specifically reserved." (*Id.* at 2.)

The closest any of this comes to Plaintiff asserting rights or defenses specific to the Subcontract is Plaintiff's assertion, in the December 9, 2016 letter, that the language of the Subcontract provides for the Subcontractor's exclusive liability for "'all contributions, taxes, deposits and payments required of employers by . . . federal, state, or local governments with respect to wages, salaries . . . .'" (*Id.*) However, Defendant is only entitled to bring a claim against Plaintiff on the bonds, not on the Subcontract, and in these letters Plaintiff merely states its position as to whether Defendant may make or properly has made a claim on the bonds, without, for example, threatening to counterclaim for a breach of the incorporated Subcontract. *See, e.g.*, *DSI v. Carothers*, 2017 WL 3674975, at *7 n.7 (D. Kan. Aug. 24, 2017) (in related matter, rejecting

Carothers' proposed application of "direct benefits" estoppel theory and distinguishing case in which DSI was estopped after asserting affirmative claims for breach of incorporated contract).

Similarly, there is no record evidence suggesting that Plaintiff obtained any direct benefits in its commercial dealings with third parties on the basis of asserting Plaintiff's rights under the Subcontract, or any direct benefits on the market generally other than the mere fact of Plaintiff's surety relationship with Seven Hills. The latter is not enough to estop Plaintiff from avoiding arbitration. *Cf. Doctor's Assocs.* at *3 ("the fact that a nonsignatory is merely a signatory's successor or corporate parent need not trigger estoppel." (citation omitted)). As Defense counsel noted at oral argument, the entire purpose of the bond was for Plaintiff to assume responsibility for all *obligations* of Seven Hills under the Subcontract. But there is nothing about this surety relationship that as a matter of law suggests that Plaintiff has therefore also assumed any or all of the *benefits* to which the Subcontract entitled Seven Hills.

Accordingly, Defendant has not provided any record evidence demonstrating that Plaintiff has directly derived benefits under the Subcontract. The Court doubts that Plaintiff's single reference to the Subcontract language in the December 9, 2016 letter constitutes Plaintiff receiving a direct benefit from the Subcontract in such a way as to make it inequitable to permit Plaintiff to avoid enforcement of the Subcontract's arbitration provision. Defendant directs the Court to no relevant legal authority so holding, and so Defendant's first estoppel theory must be rejected.

On March 12, 2018, Defendant filed a notice of supplemental authority containing the order of the U.S. District Court for the Northern District of Georgia, holding that DSI was estopped from avoiding arbitration brought by Carothers. Of the three courts to consider this issue between these two parties, that court was the first to find that estoppel applied. But in so doing, the court specifically distinguished the facts of that litigation from the other three cases filed by DSI

(including this one), noting that "the case at bar is distinguishable in certain key respects." *DSI v. Carothers*, No. 1:17-CV-1979-SCJ, at *5 (N.D. Ga. Feb. 27, 2018). "While all four cases filed by Developers against Carothers were substantially the same, this case involves a claim the others did not." *Id.* In the Georgia litigation, unlike in this case or the cases filed in Kansas or South Carolina, DSI "explicitly [sought] a declaratory judgment establishing that Carothers breached the subcontract with [the subcontractor] by forcing 'material changes in the terms, conditions and scope of work' on [the subcontractor]." *Id.* (citation omitted). Plaintiff has not brought claims on the subcontract here, so under the logic of the decision to which Defendant directs the Court, estoppel is not warranted here.

Defendant also raises a second theory for why estoppel should apply, arguing that Plaintiff should be estopped from avoiding arbitration because Plaintiff's "rights, obligations, and legal assertions are intertwined with issues arising under [the Subcontract, which] provides for arbitration." (Mem. Supp. Def's Mot. Summ. J. [Doc. # 32-1] at 8.)

Plaintiff's claims and defenses on the bonds do appear to be substantially intertwined with Defendant's claims under the Subcontract. However, all of the authority that Defendant cites in support of this theory involves *non-signatories* to arbitration provisions compelling arbitration for *signatories* to the provisions, which as discussed above, is the inverse of the facts here. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) ("Our cases have recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where . . . 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001))); *Vertucci*, 2006 WL 1688078, at *6.

Defendant further maintains that because Plaintiff incorporated the Subcontract by reference, Plaintiff should therefore be considered a signatory to the Subcontract that was executed between Seven Hills and Defendant. While Plaintiff may be considered a signatory for some purposes, courts estopping parties from contesting the validity of arbitration provisions have used the term "signatory" to mean the "party who agreed to arbitrate." The reason that these signatories are compelled to arbitrate via estoppel rather than through direct enforcement of the arbitration provision is simply because the arbitration provisions in question did not expressly provide rights of enforcement to third parties—i.e. "non-signatories." To suggest that Plaintiff is a signatory in the sense of having actually agreed to arbitrate as a result of Plaintiff's incorporation by reference of the Subcontract is to beg the question, and is an untenable reading of the Subcontract, as discussed above.

Accordingly, Defendant's theories of estoppel find no support in the record or the law. Plaintiff's Motion for Summary Judgment must be granted, and Defendant's Motion for Summary Judgment denied.

2. *Defendant's Request for Transfer of Venue*

In the alternative, Defendant requests that if it is "not granted the relief set out above enforcing the arbitration provision, then [Defendant] should . . . be granted a transfer of this case to the United States District Court for the Middle District of Georgia." (Mem. Supp. Def's Mot. Summ. J. at 14.) Defendant contends that such a transfer would be most convenient for the parties and witnesses, and that "one lawsuit is better than four." (*Id.* at 15.)

But Defendant does not explain why this requested relief still makes sense in light of the fact that the other three related lawsuits here will not be consolidated into a single proceeding: The U.S. District Court for the District of South Carolina held that the arbitration provision should be

enforced and ordered the case transferred to the Southern District of Mississippi, so that arbitration could be compelled in that district, as did the U.S. District Court for the Northern District of Georgia. By contrast, the U.S. District Court for the District of Kansas found that the arbitration provision could not be enforced against Plaintiff and retained jurisdiction. Accordingly, there will be no single consolidated proceeding anywhere, much less in the Middle District of Georgia, where, as the Court understands it, no related matter is currently pending.

Plaintiff argues that transfer to Georgia would be inappropriate because (1) Defendant is a Mississippi corporation, (2) Plaintiff is a California corporation, (3) this project took place in Connecticut, (4) Defendant is not a resident of Georgia, and (5) none of the events giving rise to Defendant's claims on the bonds occurred in Georgia. (Mem. Supp. Pl.'s Mot. Summ. J. [Doc. # 31] at 25.)

Under the Change of Venue statute, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The Court sees no basis to conclude that this action could have been brought in the Middle District of Georgia, so the case may only be transferred upon the consent of all parties, which Plaintiff declines to give. Defendant contends that Plaintiff has effectively consented to change of venue by filing a related case in a *different* district within that state. However, these two actions involve different projects in different states. Accordingly, Plaintiff cannot be said to have implicitly consented to transfer, and the Court lacks the statutory authority to transfer the case to the Middle District of Georgia.

### III.    Conclusion

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment. The Court DENIES Defendant's requested transfer to the U.S. District Court for the Middle District of Georgia. Declaratory Judgment is entered in favor of Plaintiff that it is not bound to arbitrate Defendant's insurance coverage claims arising out of this Project. Because in this case a separate injunction would afford Plaintiff no additional relief beyond that already provided by the Declaratory Judgment, the Court declines to grant Plaintiff's request for a permanent injunction. There remaining no further claims, the Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 19th day of March 2018.